### DALY v. WEBSTER et al.

*(Circuit Court of Appeals, Second Circuit. October 4, 1892.)*

**1. COPYRIGHT—FILING COPY OF TITLE OF WORK—VARIANCE.**
The copy of the title of a play, filed to obtain copyright under Act Feb. 3, 1831, (4 Stat. 436,) was, "Under the Gaslight, A Romantic Panorama of the Streets and Homes of New York." The title of the play published was, "Under the Gaslight, A Totally Original and Picturesque Drama of Life and Love in These Times, in Five Acts." *Held,* that there was no material variance. The title of the play, within the meaning of the act,—being the name to be given to it by the public, and by those who might buy and sell it,—was, "Under the Gaslight;" the remaining words being mere description of the general character of the work, apparently not intended, and not in fact used, as any part of the title. 47 Fed. Rep. 903, and 39 Fed. Rep. 265, reversed.

**2. DOCUMENTARY EVIDENCE—PUBLIC RECORDS.**
In the office of the clerk of a United States district court, in which titles and copies of copyright works were deposited to obtain copyright under Act Feb. 3, 1831, (4 Stat. 436,) a book of original entry was kept, in which the clerk having charge of the matters made, in regular course of business, daily, as articles were presented, entries of the titles, when tendered, the nature of the articles on which copyrights were sought, the dates of the applications, and the times when the articles were deposited. *Held,* that an entry therein, showing the deposit of a copyright work,— the clerk who made it having since died,—was, in the absence of any proof to the contrary, sufficient evidence of such deposit, although the duty to make the entry was imposed on the clerk, not by express statute or order of court, but by direction of his superior officers, and the rules and practice of the office.

**3. COPYRIGHT—DRAMATIC COMPOSITION.**
A scene in a play represented a person put in peril of his life by being placed by another on a track over which a railroad train was momentarily expected to arrive, and so fastened that he could not move from his dangerous position, and his rescue by a third person who, surmounting various obstacles, succeeded, at the last moment, in releasing him. It was displayed before the audience by a series of incidents grouped in a certain sequence, and realistically presented, but with very little dialogue. *Held,* that such combination of dramatic events, although its success was largely dependent on what was seen, irrespective of the dialogue, was a dramatic composition, entitled to protection under the copyright laws. Daly v. Palmer, 6 Blatchf. 256, followed.

**4. SAME—EXTENT OF RIGHT—INFRINGEMENT.**
It appeared that such incidents of peril from railroad trains, and rescue therefrom, were common literary property, and that the composition was novel only by reason of the introduction of the rescuer. *Held,* that the copyright must be confined closely to the particular story, and that a representation which dispensed with the presence of the rescuer told a substantially different story, and was not an infringement.

Appeal from the Circuit Court of the United States for the Southern District of New York.

In Equity. Suit by Augustin Daly against George P. Webster and William A. Brady, impleaded with Henry C. Miner, for in-

fringement of copyright. The circuit court dismissed the bill. Complainant appeals. Reversed.

The bill alleged that complainant was the author and owner of the copyright of the play entitled "Under the Gaslight," copyrighted August 1, 1867, under the act of February 3, 1831, (4 Stat. 436;) that the play had been very successful and popular; that its cause of its success was the originality and novel nature of its principal scenes and incidents,—particularly the scene and incident in the end of the third scene of the fourth act, commonly called the "railroad scene," in which one of the characters was represented as secured by another of the characters, and laid helpless on a railroad track, in such a manner, and with the presumed intent, that the railroad train, momentarily expected, would run him down and kill him, and, just at the moment when such fate seems inevitable, another of the characters contrives to reach the intended victim, and drag him from the track, as the train rushed in and passed over the spot; that this incident and scene were entirely novel, and unlike any dramatic incident known to have been theretofore represented on any stage, or invented by any author; that said railroad scene was, as soon as produced and represented, and ever since, regarded, whenever witnessed, as one of the most novel, startling, and attractive incidents ever represented on the public stage; that the play was repeatedly produced and represented in many cities and towns, to the great profit of complainant; and that the chief value of said play, and its popularity, depended upon said railroad scene, contained in it.

The infringement complained of consisted in performing a scene in the play entitled "After Dark," written by Dion Boucicault, also known as the "railroad scene." As to this, the bill alleged that defendants, in producing said scene, were using and producing several of the scenes and incidents of complainant's play, varying them slightly, representing a railroad running underground in the city of London, substituting for the victim to be killed on the railroad a man tied by a rope, and suspended from an aperture in the top of the tunnel, and hanging over the rail, where he would be struck by the engine, instead of a man tied and laid upon the track, as in complainant's play, and, for the rescuer of the victim to be killed on the railroad, a man shut up in a wine cellar, and breaking his way through a window or wall into the tunnel, instead of breaking a way out of a switch tender's house, as in complainant's play; that said scene in the play, "After Dark," as produced by defendants, was a palpable imitation of complainant's railroad scene, and was plagiarized therefrom, and put into the play of "After Dark," by defendants, for the purpose of obtaining the pecuniary benefit which might otherwise result to complainant from the representation of his play.

The bill asked for an injunction to restrain defendants from performing said railroad scene in the play of "After Dark," and for an accounting from defendants of their profits from the production of said scene in that play. On the filing of the bill a motion was made for a temporary injunction, which was denied by the circuit court on the ground that complainant had not a valid copyright in his play, because of a material variance between the copy of the title deposited by him to obtain copyright, and the title of the published play. 39 Fed. Rep. 265.

An answer to the bill, and a replication, were filed. On final hearing in the circuit court on the pleadings and proofs, the bill was dismissed; the court following the previous decision, as res judicata. 47 Fed. Rep. 903. Complainant appeals.

Stephen H. Olin, (Olin, Rives & Montgomery, on the brief,) for appellant.

A. J. Dittenhoefer and David Gerber, for appellees.

Before LACOMBE and SHIPMAN, Circuit Judges.

PER CURIAM. This is a suit to enjoin the defendants from producing a portion of a play entitled "After Dark," and written

by one Dion Boucicault, on the ground that such portion is a colorable imitation of a scene in a copyrighted play written by the complainant, and entitled "Under the Gaslight."

The law regulating copyrights requires, as a condition indispensable to its creation, and to the existence of any literary property in a published work, that there be deposited before publication, in the proper office, "a printed copy of the title of the book," etc. The circuit court, in the case at bar, held that that condition had not been complied with; there being, as it found, a material variance between the registered and the published title, whereby the substantial identity between the two titles is doubtful, and might deceive the public into the belief that they refer to different publications.

The title, as filed, was:

UNDER THE GASLIGHT,

A Romantic Panorama of the Streets and
Homes of New York.

By

AUGUSTIN DALY,

Author of "Leah, the Forsaken,"
"Griffith Gaunt," "Taming a Butterfly," etc.

The title, as published, was:

UNDER THE GASLIGHT,

A Totally Original and Picturesque Drama

of

Life and Love in These Times,

in Five Acts.

By AUGUSTIN DALY,

Author of "Leah, the Forsaken," Griffith
Gaunt," "Taming a Butterfly,"
etc., etc.

That there is a difference between the title pages is plain, but we are unable to assent to the proposition that there is a variance in the title. What is the title of a book which the statute requires the author to file? It is the name which is given to the book, and by which it is designated and is to be known; the name by which it is to be called in the speech of the people; by which it is to be inquired for and sold. It may also include a subtitle, but it does not include a description of the book upon the title page. Thus, the title, "Webster's Dictionary," would be the title of the book, although a description of the book, as "An American Dictionary of the English Language," should follow; and if, in place of "American," the words "United States" should be substituted, there would be no variance. Tried by this rule, we find here no variance in the title. The name of the play, the title to be given to it by the public, and by those who may buy and sell it, is "Under the Gaslight;" the words immediately following, between the commas, are a mere description of the general character of

the work, apparently not intended to be, and not in fact actually, used as any part of the title. The very arrangement of the words by the printer, and the choice of type, tend to show that the author did not mean them for a subtitle, and there is nothing in the record to constrain us to give them any such character.

In support of the decree of the court below, appellees contended that there was no proof that a copy of the book was delivered, as the statute required, within three months after publication, to the clerk of the district court for the southern district of New York, where the complainant then resided. The deputy clerk of that court produced from the said clerk's office a daybook kept by the copyright clerk. The entries were in the handwriting of such copyright clerk, who was dead. In his lifetime he had charge of the copyright desk, receiving applications for copyrights, preparing the certificates of copyrights, filing books and papers, and forwarding copyright matter to Washington. The book was a book of original entry, kept in the regular course of business, daily, as articles were presented. There were entered in the book the titles of the copyrights; when tendered; the nature of the articles upon which the copyrights were sought; the dates of the applications for them; and the times when the articles themselves were deposited. It was the duty of the clerk who kept the daybook, (apparently, a duty imposed upon him, not by any express statute or order of court, but by the directions of his superior officers, and the rules and practice of the office,) on receipt of a work deposited under the copyright law, to make an entry in the last column of the book of the receipt of the deposit. An entry appeared in this book, in his handwriting, showing the deposit of "Under the Gaslight" on August 1, 1867, which was within the three months. This record, kept by a person "in the discharge of a public duty," was competent evidence of the transaction which was therein stated to have occurred, (Evanston v. Gunn, 99 U. S. 660; 1 Greenl. Ev. § 483;) and, in the absence of any proof to the contrary, it was sufficient evidence of the deposit of "Under the Gaslight," as alleged.

Upon the main point of the case, namely, whether the combination or series of dramatic events, (apart from the dialogue,) which makes up the particular scene or portion of the play claimed to be infringed, is a dramatic composition, and as such entitled to protection under the copyright laws, it is necessary to add but little to the exhaustive opinion of Judge Blatchford, reported in Daly v. Palmer, 6 Blatchf. 256. The same scene in the same play is elaborately discussed by him, and in his conclusion, that it is a dramatic composition, we concur. In plays of this class the series of events is the only composition of any importance. The dialogue is unimportant, and, as a work of art, trivial. The effort of the composer is directed to arranging for the stage a series of events so realistically presented, and so worked out by the display of feeling or earnestness on the part of the actors, as to produce a corresponding emotion in the audience. Such a composition, though its success is largely dependent upon what is seen, irre-

spective of the dialogue, is dramatic. It tells a story which is quite as intelligible to the spectator as if it had been presented to him in a written narrative. The mere exhibition of mechanical appliances to represent incidents is not to be included within this classification. There must be a series of events, dramatically represented, in a certain sequence or order. In other words, there must be a "composition," i. e. a work invented and set in order,—a work of various parts and characters, which, when put upon the stage, is developed by a series of circumstances.

The particular composition which is the subject of this action may be thus briefly stated: An individual is put in peril of his life by being placed by another upon a track over which a railroad train is momentarily expected to arrive, and so fastened that he cannot move from his dangerous position. From this peril he is rescued by a third person, who, surmounting obstacles, succeeds, at the last moment, in releasing him. With very little dialogue, and by the representation of successive incidents, this scene is displayed before the audience; and to its presentation, as the author conceived it, the important incidents grouped in the sequence he devised are essential. Together, they make up his story, or "dramatic composition." In their presentation individually, and without such grouping, there would be no such composition.

It is plain that the author of such a work, where various incidents, in themselves common literary property, are grouped to form a particular story, must be confined, in his claim to copyright, closely to the story he has thus composed, and that another author, who, by materially varying the incidents, materially changes the story, should not be held to be an infringer. To illustrate: In the case at bar the defendants at one time represented their play with no change in its material elements, except that the imperiled person was suspended over the track, a foot or two from the ground, instead of being fastened directly to the track itself. Manifestly, the grouped incidents, as thus altered, tell the same story as in the complainant's play. On another occasion, however, the defendants' play was so modified that the imperiled person was placed upon the track, so stupefied with some drug as to be unable intelligently to direct his own movements, and so environed (the scene is laid in a narrow tunnel) that it seemed reasonably certain he would be in his place of peril when the train arrived. So far, the change of incident made no material change in the story; but he was saved from death without the aid of any third person,—at one time, by staggering off the rails in time; at another, by striking inadvertently against the operating arm of a switch, which moved, and thus side-tracked the train. This grouping of incidents, dispensing, as it does, entirely with the rescuer, whose efforts to aid, and whose struggles to overcome the obstacles in his (or her) way, are an important part of the complainant's composition, tells a substantially different story. Moreover, in all except the rescue by a third person, the complainant was not the first to conceive the story. Of course, in mere peril

and rescue,—peril which the imperiled person is helpless to avert, rescue at the last moment by exertion against obstacles,—there was nothing which any one, in this age of the world, could claim as his own. What the complainant contends was his own conception was the introducing of the moving railroad train as the source of peril, and confinement to its track as a method of assassination. But before he copyrighted his play there had been published in a monthly magazine (the Galaxy) a story entitled "Captain Tom's Fright." It differs entirely from the complainant's play, except that it contains a "railroad scene," in which a person is tied upon a railroad track so as to be in apparent peril of his life from any approaching train. From this peril he is rescued by the circumstance, unexplained and unexpected, that a switch had been turned so that the train, which did come, passed him, not on the straight track, but on a cut-off. Such incidents of peril from railroad trains, and rescue therefrom, being common literary property, (it does not appear that "Captain Tom's Fright" was copyrighted,) it is apparent that the complainant's composition is novel only by reason of the introduction of the rescuer, whose presence is therefore so essential to the "dramatic composition" that a representation which dispenses with his presence would not be an infringement.

The performances of the defendants' play with the scene unchanged, (although such performances were had after the suit was begun,) and the performance in Philadelphia, before suit, with the immaterial change above referred to,—of suspending the imperiled person above the track,—sufficiently indicate an intention on the part of the defendants to infringe complainant's copyright, unless restrained by a decree of the court. The decree of the circuit court is therefore reversed, and the cause remanded, with instructions to enter the usual decree for account and perpetual injunction. Costs of both courts to appellant.