O'NEILL v. GENERAL FILM CO.

(Supreme Court, Special Term, New York County. April 8, 1915.)

1. LITERARY PROPERTY ⬡⟹8—INFRINGEMENT—MANUSCRIPT DRAMA—PHOTO PLAY.

The General Film Company's motion picture play, "Count of Monte Cristo," will, absent a convincing explanation, be held an infringement of the Fechter manuscript, "Monte Cristo;" it containing many things original in the latter, and not found in the novel or earlier dramatizations.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 7; Dec. Dig. ⬡⟹8.]

2. ADVERSE POSSESSION ⬡⟹6—OWNERSHIP—MANUSCRIPT DRAMA.

Title to a manuscript drama, good against an infringer, as well as the original owner, may be acquired by continuous, open, and notorious possession, with maintenance of exclusive right.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 7–10, 12–23; Dec. Dig. ⬡⟹6.]

3. LITERARY PROPERTY ⬡⟹5—COMMON-LAW RIGHT IN PLAY—PERFORMANCE ABROAD—PUBLICATION.

Public performance in England of a manuscript play was not such publication of it as to destroy the common-law rights in it in the United States.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⬡⟹5.]

4. LITERARY PROPERTY ⬡⟹5—PUBLICATION—FILING FOR CENSORSHIP.

Filing a manuscript play with the Lord Chamberlain of England for purpose of censorship, as required by the statute, was not a publication, destroying common-law rights in it.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⬡⟹5.]

5. LITERARY PROPERTY ⬡⟹5—PUBLICATION—ADVERTISING POSTERS.

It is not a publication, whereby one surrenders his common-law rights in a manuscript play, to put out, for advertising purposes, pictorial posters of many of the striking scenes in it; they not telling the story.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⬡⟹5.]

6. LITERARY PROPERTY ⬡⟹5—PUBLICATION—MANUSCRIPT DRAMA—COPYRIGHTING PHOTO PLAY.

It is not a publication of a manuscript drama, whereby common-law rights therein are destroyed, that the owner licenses one to give motion picture presentation of it, and the licensee copyrights its films under Copyright Act March 4, 1909, c. 320, § 11, 35 Stat. 1078, as amended by Act Aug. 24, 1912, c. 356, 37 Stat. 488 (U. S. Comp. St. 1913, § 9532).

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⬡⟹5.]

Action by James O'Neill against the General Film Company. Judgment for plaintiff.

See, also, 155 App. Div. 887, 140 N. Y. Supp. 1134.

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Dittenhoefer, Gerber & James, of New York City (David Gerber, of New York City, of counsel), for plaintiff.

Nathan Burkan, of New York City, for defendant.

SHEARN, J. Plaintiff seeks a judgment enjoining the defendant from exhibiting by means of motion pictures the scenes or incidents of a play or dramatization, known as the Fechter version of the "Count of Monte Cristo," and for an accounting. In or about the year 1844 Alexander Dumas wrote the novel "Count of Monte Cristo," which was published by him in France and in this country, in two volumes consisting of about 600 printed pages in each volume, having about 70 characters, with a wealth of romantic scenes and incidents. About 1848 Dumas dramatized his novel under the title "Monte Cristo," in the French language and published same. His dramatization consisted of four parts, each covering 122 to 144 printed pages, with 20 acts, 37 tableaus, 221 scenes, and 59 characters. The play in this form was, of course, impossible for dramatic purposes. In October, 1868, one Benjamin Webster, manager of the Adelphi Theater, Strand, London, deposited in the Lord Chamberlain's office a drama or play printed in book form under the title "Monte Cristo," written by one Charles Fechter. In this dramatization, Fechter selected portions of the novel which he deemed valuable for dramatic purposes, disregarding and eliminating over 55 of the characters appearing in the novel, and many hundreds of the scenes and incidents therein. Fechter changed many of the characters, reconstructed the scenes, transposed and epitomized some of the incidents found in the novel, and created an original work, concentrating his literary creation, so as to permit of the performance upon the stage within the limits of an evening performance, which required ability of a high order as a dramatist, and originality and much skill. The Lord Chamberlain filed same in his office and issued to Webster a license authorizing him to give on the 19th day of October, 1868, a public representation of the drama, which was given at the Adelphi Theater on said date pursuant to the license. Prior to the year 1870 a dramatization of the novel was made and published by one Thomas H. Lacy, and was called "Lacy's Acting Edition," which version was republished by Samuel French under the title "French's Acting Edition (Late Lacy's)." French's Acting Edition consisted of 5 acts, 17 scenes, 26 characters, and closely followed the novel. This version was long and cumbersome, and its production was not continued. Prior to 1883, Fechter, assisted by one Arthur Leclercq, wrote a further condensation of his dramatization of the novel for stage production, which thereafter became known as the Fechter version of Monte Cristo. This dramatization is the only one of the novel which has been performed with success. The Fechter version was kept in manuscript form, and has never, at any time, been printed and published or dedicated to the public. Fechter gave public performances of the drama from his version from 1873 to the time of his death in 1879. Some of the performances were at the Globe Theater, Boston, which was owned by one Cheney. John Stetson succeeded Cheney as the proprietor of the Globe Theater, and came into possession, from Cheney, of the Fechter manuscript. Stetson was in possession of

the manuscript in 1883 and produced the play with great success; the plaintiff herein being the leading actor, and playing the part of Edmund Dantes, known in the latter part of the play as the Count of Monte Cristo.

In June, 1885, plaintiff purchased for $2,000 from Stetson the Fechter version of the play, and Stetson delivered to the plaintiff the manuscript, which has ever since been in the possession of the plaintiff. At the time of the purchase of the play, Stetson delivered to the plaintiff with the manuscript a bill of sale or transfer of the title of the play and manuscript from Stetson to the plaintiff. Ever since 1885, plaintiff has been in the continuous, uninterrupted, open possession of the play, and the manuscript thereof, and has performed upon the stage in the various cities of the United States the play known as the Fechter version more than 5,000 times, by reason of which plaintiff has become identified with the play, and has made it famous; the play being the principal and almost the only dramatic production in which the plaintiff has appeared since 1885. The right and title to the play of the plaintiff has never been questioned, and royalties have been received by and paid to the plaintiff from others who have sought and acquired from him a license to give performances, which royalties have continued down to and since the commencement of this action. The plaintiff has enforced, by suits, his right and claim against persons who undertook to give a performance of the play without his consent or license, and the courts have upheld, protected, and recognized his right and title to the play, which has been a great artistic and financial success, and is of great value to the plaintiff. The defendant is engaged in the business of furnishing films of photo plays to managers and proprietors of motion picture theaters to enable them to give public theatrical performances of photo plays at the theaters of its licensees for profit. Prior to the commencement of this action the Selig Polyscope Company prepared for the defendant a motion picture film of a play called "Count of Monte Cristo," the films of which the defendant distributed and leased to exhibitors of motion picture films for production and representation throughout the United States. It is claimed that such motion picture play was prepared from and is an appropriation of the plaintiff's Fechter version and infringes upon plaintiff's common-law property right therein. Defendant resists plaintiff's claim of title, and claims that the motion picture play was produced by resort to original sources, alleged to be open to all, namely, the novel and the dramatic versions antedating the Fechter version, and that, in so far as there is any similarity between the motion picture play and the Fechter version, it is lawful and proper, in that the similar incidents and characters are found in the novel and earlier versions.

[1] The court has examined the novel, the Dumas dramatization, the Webster (or first Fechter version), the French or Lacy versions, the Fechter version, and has, by arrangement with and in the presence of counsel for both the parties, witnessed a representation of the defendant's motion picture play. Inextricably interwoven into the photo play are the principal and most striking incidents original with the Fechter version, and found only in the Fechter version, of the play.

A person witnessing a performance of the photo play, and familiar with the Fechter version, will readily recognize it, and the story as told in the Fechter version is told in the photo play in substantially the same order and sequence. Over 50 of the characters omitted from the novel by Fechter in preparing his version are also omitted in the photo play. Scenes selected from the novel by Fechter are used in the photo play in the same way and as used in the Fechter version, and the scenes omitted in the Fechter version are omitted in the photo play. Words used only in the Fechter version and not found in the novel are flashed upon the screen in connection with the performance of the photo play, and are a part of the films used to give the exhibition, and said words are used by the characters and in connection with incidents originated by Fechter in his dramatization, and not found in the novel, as used in the Fechter version. While there are in the photo play, and especially in the earlier part, scenes that are not found in the Fechter version, practically every great dramatic climax, original in the Fechter version, and not found in the novel or in any of the earlier versions, is reproduced in the photo play. It would extend this opinion to undue length to set forth in detail an analysis of these striking similarities.

A comparison of the Fechter version and the photo play with one another and with the novel and earlier versions leaves no doubt that the Fechter version was used for the production of the photo play, and that in the photo play the defendant has appropriated that which gave the Fechter version its dramatic value and its success. The learned counsel for the defendant has, with industry and skill worthy a better cause prepared an elaborate analysis pointing out innumerable instances of scene and incident in the photo play that are to be found in the novel and in the earlier versions, and many that are not found in the Fechter version. It is, of course, not unnatural that these instances of similarity between the photo play and the novel and the other dramatic versions, including Fechter's, should exist, and proves nothing, for Fechter's version was dramatized from the novel, though changed, rearranged, condensed and strengthened as above noted. In a case of this sort what attention should be focused upon are the striking instances of similarity between the photo play and the Fechter version that are not found in the novel or in the earlier versions. Where, as here, a party charged with literary piracy claims to have gone to the common source and does not produce the man who did the work for him, so that he may be cross-examined as to the sources from which he took his work and account for the singular coincidences found in the piratical copy and complainant's work, a court of equity needs little additional proof on the question of piracy. If characters, incidents, omissions, or additions are found in the complainant's dramatization, not found in the published book or common source, then, in the absence of a convincing explanation, the court is justified in finding, and invariably does find, that the complainant's work has been infringed. French v. Connelly, 1 Week. Dig. 196; Frank Shepard Co. v. Taylor Pub. Co., 193 Fed. 991, 113 C. C. A. 609; White v. Bender (C. C.) 185 Fed. 921, 925.

[2] We come, then, to the defendant's technical defenses. It is asserted that the plaintiff cannot recover, because he has not shown his exclusive ownership of the Fechter version. Irrespective of the evidence afforded by Stetson's declarations when he sold the play to the plaintiff, and the presumptions arising from the relations of his predecessor Cheney with Fechter, and the production of the play by Cheney and Stetson at the Globe Theater, the plaintiff, coming rightfully into possession of the play from the ostensible owner and its only producer in 1885, and having been for 30 years in continuous and open and notorious possession of the play, and having throughout said period successfully maintained exclusive right thereto against the world, has valid title to the play by adverse possession. In Lightfoot v. Davis, 198 N. Y. 261, at page 265, 91 N. E. 582, at page 583 (29 L. R. A. [N. S.] 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747), the court said:

"We have in our state, however, no statute relating to the adverse possession of chattels or personal property, nor do I know of any in any other state. Nevertheless, it seems to be the generally accepted doctrine that by adverse possession title to chattels may be acquired which will be paramount to that of the true owner. Though there are no decisions in our courts on the question, they are numerous in other jurisdictions. Brent v. Chapman, 5 Cranch. 358 [3 L. Ed. 125]; Layne v. Norris, 16 Grat. (Va.) 236; Newby v. Blakey, 3 Hen. & M. (Va.) 57; Dragoo v. Cooper, 9 Bush (72 Ky.) 629; Carr v. Barnett, 21 Ill. App. 137; Gaillard v. Hudson, 81 Ga. 738 [8 S. E. 534]; Connor v. Hawkins, 71 Tex. 582 [9 S. W. 684]; Chapin v. Freeland, 142 Mass. 383 [8 N. E. 128, 56 Am. Rep. 701]. In Campbell v. Holt, 115 U. S. 620 [6 Sup. Ct. 209, 29 L. Ed. 483], in discussing the power of the Legislature to revive an outlawed debt by repeal of the statute of limitations, Judge Miller wrote: 'Possession has always been a means of acquiring title to property. It was the earliest mode recognized by mankind of the appropriation of anything tangible by one person to his own use, to the exclusion of others, and legislators and publicists have always acknowledged its efficacy in confirming or creating title. The English and American statutes of limitation have in many cases the same effect, and, if there is any conflict in the decisions upon the subject, the weight of authority is in favor of the proposition that, where one has had the peaceable, undisturbed, open possession of real or personal property, with an assertion of his ownership, for the period which, under the law, would bar an action for its recovery by the real owner, the former has acquired a good title—a title superior to that of the latter, whose neglect to avail himself of his legal rights has lost him his title. This doctrine has been repeatedly asserted in this court. Leffingwell v. Warren, 2 Black, 599 [17 L. Ed. 261]; Croxall v. Shererd, 5 Wall. 268, 289 [18 L. Ed. 572]; Dickerson v. Colgrove, 100 U. S. 578, 583 [25 L. Ed. 618]; Bicknell v. Comstock, 113 U. S. 149, 152 [5 Sup. Ct. 399, 28 L. Ed. 962].'"

Title in that case was held to be a bar to an action for the recovery of the chattel by the real owner. Here an infringer, who makes no claim of ownership, attacks the title. In Monnot v. Murphy, 207 N. Y. 240, 100 N. E. 742, the court went so far as to hold that an invalid title is as effectual, as a constituent of the notice to the rightful owner that the occupation under it is in defiance of his title, as a valid claim; and that possession, with acts of ownership, raises a presumption of title. Property in a manuscript or in the literary production embodied therein is not distinguishable from any other personal property. It is governed by the same rules of transfer and succession, and is protected by the same process, and has the benefits of all the remedies accorded to other property, so far as applicable.

[3] Defendant's next proposition is that the performance of the Webster (or first Fechter) version in England on October 19, 1868, was a publication which destroys the common-law rights in a manuscript play in this country. There is the highest authority against this contention. Ferris v. Frohman, 223 U. S. 424, 32 Sup. Ct. 263, 56 L. Ed. 492.

[4] Defendant next contends that the filing of the play by Webster with the Lord Chamberlain for the purposes of censorship was a publication of the work. The statute made it obligatory on every manager of a theater (not owner of a play) to deposit a copy of every play, before a performance could be given, for purposes of censorship. No one has a right to make a copy of the play, as has been testified to by the representative of the Lord Chamberlain. "Such a delivery of copies of a literary production is not a publication, and could not prejudice the owner's common-law rights." Press Pub. Co. v. Monroe, 73 Fed. 196, 198, 19 C. C. A. 429, 51 L. R. A. 353. It would be most unreasonable to hold that a person who is compelled, under the law, to submit his play to censorship before production, thereby loses title to his play. In Jewelers' Mercantile Agency v. Jewelers' Pub. Co., 155 N. Y. 241, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666, referred to by counsel, the book of the plaintiff had been published and was delivered generally to subscribers and anybody could subscribe and get a copy of the book, which the court held constituted publication. After publication in that form, the common-law right was gone.

[5] Defendant next seeks to escape by claiming that the plaintiff surrendered his rights to the public by putting out pictorial posters of many of the striking scenes in the play for advertising purposes. This is not to be regarded very seriously. A dramatic composition is a work in which the narrative is told by dialogue and action, and the characters go through a series of events which tell a connected story. It may be a pantomime, and the story told in action, but to make it a dramatic composition it must tell a connected story or a series of events. Daly v. Palmer, 6 Blatchf. 256, Fed. Cas. No. 3552; Daly v. Webster, 56 Fed. 483, 4 C. C. A. 10. If that dramatic representation is published without statutory protection, the play becomes common property. A mere advertisement—a mere pictorial inducement or invitation to witness a performance—does not tell the story of the play as the actors do. It is not the story told in action, and it is not the story told in print. Therefore it is not a publication of the play or story. The construction of "a publication," under the Copyright Law, is the same as of a publication in dealing with the common-law rights in a manuscript play, and "the publication referred to in the statute" is an edition offered to the public for sale or circulation. Falk v. Engraving Co., 54 Fed. 890, 4 C. C. A. 648. See, also, Weckmeister v. Springer Lithographing Co. (C. C.) 63 Fed. 808.

[6] Finally, defendant contends that plaintiff, having, since the commencement of the action, consented to a motion picture reproduction of the Fechter version by the Famous Players Film Company and to the copyright by said company, pursuant to the Copyright Act of 1909, as amended August 24, 1912, of the motion picture play, has lost his common-law rights in the manuscript play. The motion pic-

ture representation by the Famous Players Film Company is made by that company as licensee of the plaintiff. The amendment of August 24, 1912, protects motion picture photo plays, and provides that "a title and description, with one print taken from each scene or act," must be deposited with the Librarian of Congress. Plaintiff's licensee, recognizing plaintiff's rights, merely protected the films, which are its property and creation, in the way the Copyright Law permitted it to do. Had it not done so, it could not successfully prosecute pirates who might duplicate or copy the films. No reason is apparent why the plaintiff should thereby lose his common-law rights in his play.

Judgment for plaintiff for an injunction and an accounting, with costs.