## FRANKEL v. IRWIN et al.

District Court, S. D. New York. May 28, 1918.

Philip W. Haberman and Jos. A. Arnold, both of New York City, for plaintiff.

Stern & Reubens, of New York City, for defendants.

HOUGH, Circuit Judge. Infringement of copyright is a tort, the burden of proving which is on the plaintiff, and it can be committed in only one way: By copying some substantial part of that which is lawfully copyrighted.

 When the protected matter consists in a statement of facts, the surest, and often the only, method of proving the copying, is to detect and expose the repetition of error, which original effort in the wrongdoer would have discovered and corrected. When, however, the copyright covers a work of fancy, something that is, or tries to be, pure literature, infringement consists of plagiarism. This may take at least three forms: Plagiarism of language, of incident, or of plot; i. e., the designed sequence of connected incidents.

The first offense must be determined by considering the literary flavor of the two writers; detached words and phrases are often the small change of generations of literati; no one can appropriate them altogether. The way in which a few words, or one thought, happily phrased, is passed around the literary circle perhaps for centuries, has often been shown; a good collection is "Poetical Imitations and Similarities," in Disraeli's Curiosities of Literature, vol. 2, p. 92.

 Plagiarism of incident is less well known, and more difficult of detection; yet in my generation O. Henry's unexpected climaxes have been baldly copied, and in the preceding one Dickens' Sketches by Boz had a host of imitators. It is doubtful whether incidents per se can become copyrightable literary property, but it does not take many of them, nor much causal connection thereof, to make what will pass for a plot, or scene, and constitute the action of a play; and that a scene has literary quality and can be copyrighted, and piracy may consist in appropriating the action of a play without any of the words, is well settled. Daly v. Webster (C. C. A.) 56 F. 483; Daly v. Brady (C. C.) 69 F. 285; Brady v. Daly, 175 U. S. 148, 20 S. Ct. 62, 44 L. Ed. 109; Chappell v. Fields (C. C. A.) 210 F. 864.

In this case plaintiff undertakes to prove affirmatively that Scott's farce, presented in 1915, infringes Frankel's unprinted play, copyrighted in 1901, in that both plot or action and words have been copied. In order to copy, one must have something to copy from, and (while not openly stated) it must

be believed by plaintiff that Miss Irwin, who saw his manuscript several years before Scott wrote his play, told Scott about it, and he used her tale. This is not believed; it is thought proven that the two defendants never talked with each other, and never met until after Scott's published novel was read by Miss Irwin, who at once perceived its possibilities for her style of acting, and opened negotiations for the dramatic rights. From this holding it follows that the novel was the original infringing act, for the play *is* the novel in substance and language, except as the part of Matilda has been padded and pushed forward, to give Miss Irwin in that character the leading rôle. How Scott ever had a chance to copy from Frankel when he wrote the novel remains explained.

Still all things are possible; plaintiff's effort did enjoy a few representations, and Scott may have seen it; but the only evidence of this is the asserted similarity of the two literary efforts. Undoubtedly similarity may be so great, there may be such identity in the sequence of situations, the dramatic interest may so center or depend on a single ingenious cause, as to render it "practically impossible that the similarities are coincidences." This was the court's conclusion in Dam v. Kirk La Shelle Co. (C. C. A.) 175 F. 902, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, in respect of a clever and successful play improved by defendant from a very poor one, and that case is here plaintiff's chief reliance.

■ I am quite sure that a comparison between Scott and Frankel makes some other decisions far more pertinent, e. g., Stevenson v. Harris (D. C.) 238 F. 432, Eichel v. Marcin (D. C.) 241 F. 404, and Bachman v. Belasco (C. C. A.) 224 F. 817; but plaintiff cannot complain if some effort be made to ascertain how nearly he comes to alignment with the Kirk La Shelle Case. In this case (as in that) the principal accusation is that defendants have stolen the central thought, the kernel of the plot, something without which the farce would be Hamlet with the melancholy Dane omitted.

This theory of infringement requires some consideration of what the plot or action of a play is. Absolute definition is not attempted; some explanations are sufficient for present purposes; and it is evident that the plot of a play is more than and different from the environment or setting of the characters. Many dramas and novels, too, have been (in a sense) founded on the French Revolution and our Civil War, but that does not make (much less state) the plot; it only furnishes a set of extraneous influences, affecting human beings, who desire to reach certain results; the action, scheme, or plot commonly consists in showing how human effort and intention is aided or thwarted by the greater forces with which poor humanity is surrounded. This is true even of farces, which, unless at least suggestive of genuine human thoughts, desires, and intents, are mere slapstick clowning.

■ So far as plot in this sense is concerned, there is no similarity between Frankel and Scott. There is great likeness in environment; i. e., in both a person or persons are prevented by money difficulties from going abroad, after that purpose had been announced; therefore to save their faces they determine to remain hidden in their nominally closed houses during the period of proposed absence. This does not tell a story, nor even guide one. It is hardly as much as the motif in music, of which the treatment may be grave or gay, lively or severe, and, just as it is the treatment of the motif that makes the music, so it is the treatment of the humans put into the stated environment that makes the play; indeed, this common starting point quite as easily suggests dramatic punishment of a sordid soul as the amusing difficulty of living a lie.

This incident or background for farce, comedy, drama, novel or homily is common property; no one can appropriate it, nowadays at all events. The happenings in a supposedly empty house have been too often exploited for literary purposes; and, since both these plays assume New York houses as secretly occupied by supposedly well-to-do New Yorkers during the heated term, a New York court may, I think, take judicial knowledge that the joke is much older than plaintiff's copyright.

When one attempts comparison of the two works, in those matters as to which copyright protects—that is, the spirit or soul infusing the creatures of the author's imagination, what they desire, and how they go about achievement, the reasons for their actions, and the words in which such reasons are expressed—I can see nothing but differences.

■ Counsel have furnished labored analyses of each play; the work on both sides is excellent, but is to me illustrative of the classic difficulty of not being able to see the forest for the trees. Infringement of a work of imagination is determined by the result of comparative reading on the imagination of the reader, not by a dissection of sentences and incidents, suitable for the study of a digest or text-book, but inherently unnatural for any man who has the kind of brains that make him able to adapt a work of fiction.

The object of comparison is to find out what the alleged infringer probably did; and the investigation should be gauged to the kind of man who does the sort of work under consideration.

Thus I think the first inquiry is as to words used, and the structure of sentences; here there is no similarity at all. Next as to the spirit or purpose of the two plays; plaintiff's is an elementary farce of incident, e. g., the acceptance of the daughter's lover is infinitely less important than the unexpected mechanical piano player that starts when the father bumps against a knob in a darkened room. Defendant's novel, however, has a definite theme, viz. the cure of false pride in a really kind and upright woman, when, as the result of stooping to deceive, she discovers some, at least, of the human values, and many of the petty difficulties of life, previously ignored as beneath her station. This scheme is worked out in thoroughly conventional manner in Scott's novel, through entanglements with the lover of the servant whose identity is assumed, a theme at least as old as the Italians Chaucer borrowed from, and accusations of wrong based on mistaken identity, a plan Shakespeare shamelessly took from Plautus.

The instruments of fate, the means by which the victim is chastened, punished, and purified, are utterly different; indeed, plaintiff's is not enough of a play to require them, but defendant's novel contains, well marked, the stage lawyer and clever servant, both very old, as also the more modern properties of a reporter without fear and below reproach, a private detective who is a fool, and a genial rascal of the Wallingford type. These are essential to defendant's story; they have no analogies in that of plaintiff.

The only excuse for the length of this memorandum is the earnestness with which plaintiff's case has been urged; I have no doubt there is no infringement. Defendants are allowed a counsel fee of $350 under the statute. That amount, with costs to be taxed, may be entered in decree dismissing the bill.