**NICHOLS v. UNIVERSAL PICTURES CORPORATION et al.**

District Court, S. D. New York.   May 14, 1929.

O'Brien, Malevinsky & Driscoll and I. R. Oeland, all of New York City, for complainant.

Siegfried F. Hartman and Nathan L. Miller, both of New York City, for defendant Universal Pictures Corporation.

GODDARD, District Judge.   This is a suit for the alleged infringement of a copyright, and the usual injunctive relief with an accounting is prayed for. The complainant, Anne Nichols, sues as author and copyright owner of the play "Abie's Irish Rose," and alleges that her copyright has been infringed by the defendants in their production and distribution of the motion picture entitled "The Cohens and Kellys."

The play "Abie's Irish Rose" was produced on the American stage in March, 1922. Subsequently the defendants manufactured, produced, and ever since have been distributing the motion picture "The Cohens and Kellys," which they claim to have been made by them from the play "Two Blocks Away"— a play written by Aaron Hoffman and produced several years prior thereto by Charles B. Dillingham. On January 10, 1927, complainant granted to the Famous Players-Lasky Corporation the motion picture rights to "Abie's Irish Rose."

The following is a synopsis of "Abie's Irish Rose":

Solomon Levy, a merchant of New York City, is an orthodox Jew, with deep religious objections to marriage outside of the Jewish faith, and has a son, Abie, who, while serving in the army in France, met and fell in love with Rosemary Murphy, an Irish Catholic girl, and upon their return to America they are secretly married by a Methodist minister, as Abie is aware of his father's deep

objections to his marrying outside of the Jewish faith, and Rosemary also knows that her father would resent her marrying other than a Catholic. After the marriage Abie takes her to Solomon Levy's home and presents Rosemary to his father as an Orthodox Jewess friend under the name of Rosemary Murpheski, with the hope that she will win his father's affection before he may learn that she is not a Jewess. The scheme is successful, and the father is so attracted by her that, actuated by his ardent desire to have Abie, his only son, happily married and his own wish for progeny, he expedites the engagement of Abie and Rosemary and arranges an early marriage. Just as the marriage ceremony by a rabbi is completed, Rose's father, Patrick Murphy, appears with his old friend, a Catholic priest. When Murphy realizes the situation, violent altercations take place between Solomon Levy and Patrick Murphy. It appears that the rabbi and the priest are old friends, having served together with the American forces in France during the war, and together they endeavor to reconcile the parents, and while the latter are in another room, the priest, with the connivance of the rabbi, performs a third and Catholic marriage. Both fathers refuse to forgive their child, and are torn between love for their only child and by their conception of religious duty and race prejudice. Murphy returns to his home in California; Levy chooses to regard his son as dead. Abie and Rosemary are left to their own resources. A year passes by, during which the Jewish and Irish fathers have not seen the young couple, but their love of progeny, notwithstanding their prejudices, causes each of them to visit secretly the home of Abie and Rosemary on Christmas with gifts for a "child" which has been born to the young couple. When they arrive at the home, each discovers the other laden with gifts on a similar errand. The "child" turns out to be twins; one of whom is placed in each of the grandparent's arms by the rabbi and the priest, who had arranged to be present and to aid in the reconciliation, and the reconciliation becomes complete when the sentimental appeal is added that the boy is named after Murphy, and the girl Rebecca, recalling to Levy memories of his dead wife.

The reconciliation is the occasion of friendly antics on the part of the Jewish and Irish fathers, indicating that their racial and religious warfare is over, and portrays what Miss Nichols stated was the fundamental idea of the play, "that if a boy and girl love each other nothing in the world counts, neither family, race, nor religion." There are, of course, other characters in the play, but they merely furnish background and opportunities for pathetic and humorous scenes incidental to the main plot or story, and running through the play is the frequent expression of the idea of religious tolerance.

The following is a digest of the scenario— "The Cohens and Kellys":

Nathan Cohen, a Jew, conducts a small dry goods shop in New York City, and has a daughter Nannie Cohen, for whom he has an intense love. Across the hallway, in the tenement where the Cohens reside, is the Kelly family. Kelly is an Irish policeman, and with him lives his son Terry, who is in love with Nannie, although between the families there is a long-standing and violent family feud, and the Kelly family, with the exception of Terry, are continually seeking encounters with the Cohen family and infuriating them. The Kellys and the Cohens are each violently opposed to the friendship and marriage of Terry and Nannie.

Cohen is on the verge of bankruptcy when a strange lawyer informs him that through the death of a relative he has fallen heir to $2,000,000. As a result of this the Cohen family moves into a pretentious residence in a fashionable neighborhood, and Cohen's idea is that he and his family will shun their old "East Side" friends and that Nannie shall not see Terry any more. But Terry and Nannie continue to meet, for they had already been secretly married. Upon Cohen's return from a trip to Florida, he finds that Nannie has given birth to a baby boy, and when he is informed by his wife that Terry and Nannie had been married, and that this is their child, he refuses to acknowledge or have anything to do with his son-in-law, whom he charges with marrying Nannie to get his money. Cohen's wife begs him to forgive them, but he will not. Kelly determines that he and his boy and family shall visit the Cohens to see the baby, as well as Nannie. This visit ends in a quarrel and fighting, and Cohen orders the Kelly family to leave his house. Nannie declares her allegiance to her husband, and leaves with her baby, and goes to the Kelly flat. They are shortly afterwards followed by Mrs. Cohen, who finds that Cohen will not listen to her plea for a reconciliation. She tells Cohen that his "blood is whitewashed with money."

While Cohen is home despondent, the lawyer returns and informs him that he has just discovered that the $2,000,000 which Cohen received belongs, not to Cohen, but to Kelly, who it appears was the nearest

relative of Sadie Greenbaum, who left the fortune, but that, if Cohen will divide with him, he will keep it quiet. Cohen, whose sense of honor is awakened, declines to enter into any such agreement or to keep the money, and hurries through the rain to the Kelly flat to announce the truth to Kelly. There he finds his family and young grandchild with the Kellys. He confesses that he has been a "stubborn old fool" and is about to depart, an abject and humiliated, broken man, when Kelly reminds him of the grandchild, and through the pacifying influence of their respective wives Kelly takes Cohen by the hand and calls him by his given name; both give way to tears, and Kelly places the grandchild in Cohen's arms. There is a general reconciliation, and Kelly offers to share the inheritance with Cohen and to enter into partnership with him, and the picture ends with a hilarious discussion of their future plans over a bottle of wine.

I think the above fairly describes the play and picture. Complainant does not claim that defendants have appropriated any of the dialogue from "Abie's Irish Rose," in their titles or otherwise.

Counsel for the complainant seeks to show infringement by what seems to be a new test, or at least a new method of approach, which consists of the segregation of the scenes of a play or picture, and the extraction and comparison of the ideas or emotions forming the collocation of the play and picture under consideration; the theory being that, if these be similar, the underlying ideas, emotional themes, basic characters, and "the crucible" must be similar, and hence that infringement follows. Mr. Malevinsky reflects a deep study of the technical construction of plays and motion pictures, and although he has at the trial and in his brief urged in great detail his theory as the correct test for the comparison of plays, it would serve no practical purpose to now discuss it in detail.

The law relating to infringement and plagiarism is quite well settled. But in some instances the practical application of it is not simple, because of the difficulty of determining what the precise points of similarity or dissimilarity between two dramatic or other compositions are. Mere ideas are not protected, but the manner of expressing the same ideas may be secured, and the line differentiating the idea from the expression of the idea is not always clearly defined. Mr. Malevinsky's theoretical test does not meet the full requirements of a correct test. It is not sufficient. That two productions display the same trend of emotions is not enough to show plagiarism. Emotions, like mere ideas, are not subject to pre-emption; they are common property. It is the incidents or elements, or grouping of them, which produce the emotion that are to be compared. Similar emotions may be caused by very different ideas. It is obvious that the underlying emotions reflected by the principal characters in a play or book may be similar, and yet that the characters and expression of the same emotions be different. While it is true that a sequence of like events will awaken in the average person like emotions, it does not follow that it may be correctly deduced that like emotions were produced by the same events, or substantially identical episodes.

That the same emotions are found in plays would not alone be sufficient to prove infringement, but, if similar emotions are portrayed by a sequence of events presented in like manner, expression, and form, then infringement would be apparent. Also, for instance, no one has an exclusive right to an idea or statement of the law—that a mere idea or fact may not be copyrighted, but that the manner of expressing or illustrating the idea or fact may be protected by copyright.

In International News Service v. Associated Press, 248 U. S. 215, at page 254, 39 S. Ct. 68, 78 (63 L. Ed. 211, 2 A. L. R. 293), Mr. Justice Brandeis, in the opinion of the court, stated:

"At common law, as under the copyright acts, the element in intellectual productions, which secures such protection, is not the knowledge, truths, ideas, or emotions which the composition expresses, but the form or sequence in which they are expressed; that is, 'some new collocation of visible or audible points—of lines, colors, sounds, or words.'"

In Dymow v. Bolton, 11 F.(2d) 690, at page 692, Judge Hough, speaking for the Circuit Court of Appeals, stated:

"* * * The copyright, like all statutes, is made for plain people; and that copying which is infringement must be something 'which ordinary observation would cause to be recognized as having been taken from' the work of another. King Syndicate v. Fleischer (C. C. A.) 299 F. 533."

He rejects the theory of dissection rather than observation to discern resemblances in plays. Judge Hough further states:

"If one compares two dramatic compositions, whether in forms suitable for the stage or for the library, what has been called the 'fundamental plot,' the 'same old plot,' or an 'old story' can assume any author's dressing

or adornment; that author can devise and use his own way of expressing that plot, and he will not infringe. \* \* \* If the appropriation complained of is of the 'combination or series of dramatic events apart from the dialogue which makes up' a particular scene, reference may be had to Daly v. Webster, 56 F. 483, 4 C. C. A. 10; Dam v. Kirk [La Shelle] Co., 175 F. 902, 99 C. C. A. 392, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173; Chappell v. Fields, 210 F. 864, 127 C. C. A. 448. And it will be quite plain that no mere plot or so-called theme was protected by these decisions. They assert the legal proposition that there may be dramatic composition in the invention and arrangement of a series of events although the 'dialogue (coincident with the events) is unimportant and as a work of art trivial.' "

See, also, Frankel v. Irwin (D. C.) 34 F. (2d) 142, for opinion of Judge Hough, wherein he states:

"Infringement of a work of imagination is determined by the result of comparative reading on the imagination of the reader, not by a dissection of sentences and incidents, suitable for the study of a digest or textbook."

In Eichel v. Marcin (D. C.) 241 F. 404, Judge Manton held that the play "Cheating Cheaters" did not infringe on the play "Wedding Presents," although there were many resemblances between the two, but that there was no copying from plaintiff's play of any plot, scene, dialogue, sentiment, or character, aside from the general features and subjects, which were open to common use and stated at page 408:

"The object of copyright is to promote science and the useful arts. If an author, by originating a new arrangement and form of expression of certain ideas or conceptions, could withdraw these ideas or conceptions from the stock of materials to be used by other authors, each copyright would narrow the field of thought open for development and exploitation, and science, poetry, narrative, and dramatic fiction and other branches of literature would be hindered by copyright, instead of being promoted. A poem consists of words, expressing conceptions of words or lines of thoughts; but copyright in the poem gives no monopoly in the separate words, or in the ideas, conception, or facts expressed or described by the words. A copyright extends only to the arrangement of the words. A copyright does not give a monopoly in any incident in a play. Other authors have a right to exploit the facts, experiences, field of thought, and general ideas, provided they do not substantially copy a concrete form, in which the circumstances and ideas have been developed, arranged, and put into shape. Holmes v. Hurst, 174 U. S. 82, 19 S. Ct. 606, 43 L. Ed. 904."

And he referred to the following statement of Lord Blackburn in Chatterton v. Cave, 3 App. Cas. 483, which seems particularly pertinent to the case at bar:

"An idea may be taken from a drama and used in forming another, without the representation of the second being a representation of any part of the first. For example, I have no doubt that Sheridan, in composing 'The Critic' took the idea from 'The Rehearsal'; but I think it would be an abuse of language to say that those who represent 'The Critic' represent 'The Rehearsal' or any part thereof; and if it were left to me to find the fact, I should, without hesitation, find that they did not."

In Daly v. Webster, 56 F. 483, at page 487, the Circuit Court of Appeals of this Circuit stated:

" \* \* \* Where various incidents, in themselves common literary property, are grouped to form a particular story, must be confined, in his claim to copyright, closely to the story he has thus composed, and that another author, who, by materially varying the incidents, materially changes the story, should not be held to be an infringer."

"It is true that an old plot could not be copyrighted, and this plot is old, but a new treatment of an old plot may be protected by copyright. \* \* \* Probably almost every conceivable plot has been the subject of many books. However, people will continue to write books, and the public continue to read them, because of the new characters and settings with which the authors surround an old plot, and such of them as are the independent productions of the authors may be copyrighted. \* \* \* It is not the subject that is protected by copyright; it is the treatment of a subject that is protected. Gunter has created new characters, scenes, and [sequence of] events. \* \*° \* " Stephens et al. v. Howells Sales Co. (D. C.) 16 F.(2d) 805, 808.

After viewing the complainant's play, "Abie's Irish Rose," and a motion picture of "Abie's Irish Rose," and the defendants' motion picture, "The Cohens and Kellys," with the love scenes between Terry and Nannie deleted, my observation leads me to the conclusion that "The Cohens and Kellys" differs quite substantially in its themes, scenes, episodes, and expression of ideas, although both make use of common property, such as Jewish

and Irish characters, marriage meeting with strong parental opposition, and final reconciliation. "Abie's Irish Rose" presents the conventional situation of Jewish boy and the Irish Catholic girl in love with each other, meeting with opposition by the parents of both, because of their strong religious prejudices.

In "The Cohens and Kellys," an Irish Catholic boy is in love with a Jewish girl, and their marriage is opposed by their respective parents because of a feud existing between the Cohen and the Kelly families, who reside in the same tenement. The plot revolves around a legacy of $2,000,000, which, through mistake, is paid to Cohen, and which it later appears rightfully belonged to Kelly, and upon discovery of the true situation that Kelly is the rightful owner of it, the inheritance is restored to him by Cohen, actuated by his own innate honesty and sense of fairness; and this eventually leads to reconciliation of the Cohen and the Kelly families and the forgiveness of their children, whom it appears had been previously married before the inheritance had been received. In "The Cohens and Kellys" the subject of religion is completely absent. Kelly's "three ideals" are expressed as being "his family, Tammany Hall, and corned beef."

In "Abie's Irish Rose," Solomon Levy, the father of Abie, is an orthodox Jew, and Patrick Murphy, the father of Rosemary, is a devout Catholic. The attitude of these two towards their respective religions is an outstanding feature of the play, and is accentuated throughout by the Jewish rabbi and the Catholic priest, who take quite a prominent part in the play. So opposed is Solomon to his son's knowing a girl who is not of his religion that Rosemary Murphy is introduced to Solomon by Abie as Rosemary Murpheski, in the hope that her natural attractions will eventually overcome his father's prejudice and lead to his forgiveness.

Both the play and the picture deal with parental opposition to their children's marriage, and in both the play and the picture the characters are Jewish and Irish. In the play, the boy and his father are Jewish; the girl and her father are Irish Catholics. In the picture, the girl and her family are Jews, and the boy and his family are Irish Catholics. In both the play and the picture the birth of a child or children help to bring about the reconciliation of the objecting parents.

Throughout the play and the picture there are minor tragedies and comedies, and there is a considerable amount of "slap-stick" comedy in "The Cohens and Kellys." In these respects there is no resemblance between the play and the picture. I should describe the "theme" of "Abie's Irish Rose" as that of love of a father for his child and a father's desire for progeny overcoming his religious prejudice, and that the "theme" of "The Cohens and Kellys" is materialism overcome by integrity.

The fundamental plot in "Abie's Irish Rose" is not new and is common property in the "public domain." The theme of the secret marriage, meeting parental opposition because of prejudice, racial or otherwise, with an Irish-Jewish background, is not new. A similar idea is found in a number of plays, including "Joseph Lewis & Son," copyrighted in 1890, where the father, an orthodox Jew, also has a son whom he wishes to take into his business, and whose predominating ambition is to have his son marry an orthodox Jewess, but who does marry a Gentile, and parental opposition is finally overcome by his love of progeny. "Krousemeyer's Alley" presents an Irishman and his son, and a Jew and his daughter, and the marriage of the girl and boy. Originally it was a German family and an Irish family, but during the war the German family was represented as a Jewish family. There is a strong opposition to the marriage on the part of both parents, because of their racial antipathy. Eventually there is a reconciliation upon the christening of a child which has been born to the young couple. "The Rabbi and the Priest," also known as "The Little Brother," was produced in 1918. The scenes in this play are laid in New York's East Side, and the father of the girl, Judith, is, like Solomon Levy, a widower deeply attached to his only child, and strongly opposed to his daughter marrying any one but an orthodox Jew; but she falls in love with a devout young Catholic, they are married, each are disowned by their parents, but are subsequently reconciled after the birth of children.

Many of the ideas in these plays and in others, which have been examined, but which are unnecessary to refer to, are similar to those found in "Abie's Irish Rose." Undoubtedly, however, the very great success which "Abie's Irish Rose" has achieved is due, not to the mere idea or plot of the play, but to the author's genius in the manner in which she has presented the plot or theme to the theater-going public, and that her play had particular attraction and appeal is quite convincingly demonstrated by its very wide popularity and by the financial returns derived from "Abie's Irish Rose."

The record discloses that in 1925 the defendant, the Universal Pictures Corporation, tried to purchase "Abie's Irish Rose" motion picture rights, and that, when the scenario of "The Cohens and Kellys" was being written, its authors "studied" the synopsis of "Abie's Irish Rose"; also that the Universal Weekly, a publication issued by the Universal Pictures Corporation, announced on the completion of its picture that its photoplay will be to the screen what "Abie's Irish Rose" is to the stage, and, while there is a fairly strong inference that the authors of "The Cohens and Kellys" gained some of their ideas from "Abie's Irish Rose," for the reasons discussed above, my conclusion is that such rights of the complainant as are protected by copyright have not been infringed; therefore that the bill of complaint should be dismissed, and accordingly a decree to that effect may be entered upon notice.