THE JEWELERS' MERCANTILE AGENCY (Limited), Respondent, *v.* THE JEWELERS' WEEKLY PUBLISHING COMPANY (now THE TRADES' WEEKLY COMPANY), ALONZO ROTHSCHILD and ALBERT ULMANN, Appellants.

1. COPYRIGHT — COMMON-LAW RIGHT OF LITERARY PROPERTY.  A statutory copyright operates to divest the author of his common-law right of literary property; and he cannot have at the same time the benefit of the copyright statute and also retain his common-law right.

2. PUBLICATION.  Publication also operates to destroy the common-law right of literary property, whether a copyright be secured or not.

3. PUBLICATION BY LEASING BOOK.  The leasing of a book for a year or term of years, to any and all persons who will accept it on the author's terms, even if these include an agreement not to disclose its contents, constitutes a publication.

4. PUBLICATION — LOSS OF COMMON-LAW RIGHT.  If a book be put within the reach of the general public, so that all may have access to it, no matter what limitations be put upon the use of it by the individual subscriber or lessee, it is published, and what is known as the common-law copyright, or right of first publication, is gone.

5. MERCANTILE AGENCY — DELIVERY OF REFERENCE BOOK TO SUBSCRIBERS A PUBLICATION.  The Jewelers' Mercantile Agency, a corporation which collected information as to the business and credit of persons in the jewelry trade, printed such information twice a year in a "reference book," which it furnished to such persons as subscribed therefor under a contract which designated the transaction as a "loan" of the volumes, and provided that the information supplied should be confidential and should not be disclosed; that the title to the books should remain in

the agency; that the books should be returned upon expiration of the subscription, and that the agency might terminate the contract and take back the books, on returning the amount of unexpired subscriptions. The agency deposited the title of one of its reference books and two copies of the book in the office of the librarian of Congress, and printed the copyright notice on the title page, in pursuance of the statute, and then delivered copies of the book to its subscribers. Thereafter, the Jewelers' Weekly Publishing Company appropriated from the agency's reference book certain material information and used it in a competing publication of its own. Thereupon, the agency brought suit in the state court to restrain such use, insisting that its copyright had failed because of its omission to make publication of the reference book, and relying upon its common-law rights. It did not appear that the reference book was confined exclusively to the jewelry trade; nor did it appear but that any one could obtain a copy of the same by subscribing for it according to the terms of the contract. *Held*, that the delivery of the book to the subscribers therefor constituted a publication; that the common-law right of first publication was, therefore, gone, and that, consequently, the plaintiff was not in a position to maintain the action.

*Jewelers' Mer. Agency* v. *Jewelers' Pub. Co.*, 84 Hun, 12, reversed.

(Argued January 13, 1898; decided March 8, 1898.)

Appeal from a judgment of the late General Term of the Supreme Court in the first judicial department, entered January 26, 1895, upon an order affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The judgment appealed from enjoined the defendant from making any use of the plaintiff's reference books or confidential sheets, and from copying, appropriating, printing, publishing or using, in any way, information taken therefrom, or furnishing such information to others.

The plaintiff, a domestic corporation, has ever since its incorporation, in 1883, been engaged in the business of a mercantile agency, which consisted in obtaining information regarding the business, street addresses, kinds and extent of business, commercial standing and mercantile credit of individuals, firms and corporations engaged in the jewelry trade in the United States and Canada. This information is printed twice a year in the form of a reference book. A duplicate of smaller form is also printed. The plaintiff also

issues weekly a confidential sheet of changes and corrections. These books and confidential sheets are furnished and lent to subscribers subscribing therefor, upon a contract which reads as follows:

"The undersigned employs The Jewelers' Mercantile Agency, Limited, from , 189 , to , 189 , to aid in answering inquiries, by verbal or written reports, reference books and correction sheets, as to the responsibility, character and standing of persons and firms in the jewelry and kindred trades, within the United States and Canada; said inquiries not to exceed one hundred and to be made within the period of this contract. For such aid and service, including the loan of , 189 and , 189 , volumes of reference book, the undersigned will pay to said company seventy-five dollars at the commencement of this subscription and for each inquiry exceeding the one hundred, thirty cents on demand. All information which may have been, or may be obtained by agents of said company, who are appointed our sub-agents, and communicated to us, shall be strictly confidential between the parties hereto, and the sub-agent's name or names are not to be disclosed by said company to the subscriber or other person, and the communicated information is not to be disclosed to the person or persons reported on. No information is guaranteed as to correctness, and the said company is not responsible for act or negligence of the sub-agent or agents. Title to the reference books to remain in said company, and books are to be returned upon expiration of subscription. On return of amount of unexpired term of subscription, said company reserves the right to terminate this contract, and the reference books are then to be returned to it.

"Dated , 188 .

"Signature:

"(The conditions of this subscription are absolute, and no verbal or other understanding will be considered or allowed by the company.)"

The plaintiff's reference book in the larger form bears upon the cover thereof, distinctly printed, the statement, "This is

the property of The Jewelers' Mercantile Agency, Limited. Confidential Reference Book." And within, conspicuously printed, appears the following: "This book is the property of the Jewelers' Mercantile Agency, Limited, and is held by      , under agreement of      eighteen      with them."

It does not appear that the reference book was confined exclusively to the jewelry trade, nor does it appear but that any one could obtain a copy of the same by subscribing for it according to the terms of such contract.

The defendant is also a domestic corporation, organized in January, 1891. It took the business which had before been carried on by the defendant Rothschild, and earlier by both Rothschild and Ulmann.

The defendant took and appropriated from the plaintiff's reference book certain material information therein contained, and made use of it in a publication of its own, which came into competition with the plaintiff's publication. It also appeared that, on the 28th day of June, 1890, the plaintiff, in pursuance of the copyright laws of the United States, deposited in the copyright office with the librarian of Congress the title of the plaintiff's book of July, 1890. And on the 28th day of June, 1890, the plaintiff, in further pursuance of said copyright law, deposited in the office of the librarian of Congress two copies of said reference book. And the said plaintiff printed on the page following the title page in the said book of July, 1890, the following notice: "Entered according to Act of Congress, in the year 1890, by the Jewelers' Mercantile Agency, Limited, in the office of the Librarian of Congress at Washington." The plaintiff, however, insists the copyright failed because of its omission to make publication of the reference book, and stands upon its common-law right that there has never been such a publication as to entitle the general public to the use of the book. The acts which defendants urge amounted to a publication were the delivery of the book to such subscribers as cared for it and were willing to become parties to the contract, *supra,* and the deposit of two of the books in the library of Congress.

*Wheeler H. Peckham* and *Leopold Sondheim* for appellants. The motion to dismiss the complaint on the merits should have been granted. The plaintiff has lost any literary property it ever had in its reference book of July, 1890, it having published the said book and having dedicated the information contained therein to the public in various ways. (U. S. R. S. ch. 6, tit. 2, §§ 80–100; *People ex rel.* v. *Tax Comrs.,* 11 Hun, 505; *Callaghan* v. *Myers,* 128 U. S. 657; *Turner* v. *Robinson,* 10 Irish Ch. 510; *Dalglish* v. *Jarvie,* 2 McN. & G. 231; *Pierce* v. *Werckmeister,* 72 Fed. Rep. 58; *Rees* v. *Peltzer,* 75 Ill. 475; *Merrell* v. *Tice,* 104 U. S. 561; *Palmer* v. *De Witt,* 47 N. Y. 532; Bump on Copyright, 517; *Keene* v. *Wheatley,* 4 Phila. 157; *Bristol* v. *E. L. Ass. Soc.,* 52 Hun, 165.) The admission in evidence of the judgment against the defendants Rothschild and Ulmann was error. (*Shaw* v. *Broadbent,* 129 N. Y. 123.) The judgment granted herein is entirely too broad and does not follow either the findings or the proof in the case. (*De Long* v. *De L. H. & E. Co.,* 89 Hun, 405; 30 Fed. Rep. 774.) The whole record in this case contains no evidence that the defendants, or their agents, have incorporated in the directory of August, 1891, any information obtained from the plaintiff's reference book of July, 1890. (*Dilleber* v. *H. L. Ins. Co.,* 69 N. Y. 260; *Miller* v. *Montgomery,* 78 N. Y. 282; Drone on Copyright, 429.)

*Howard Mansfield* for respondent. The court below had jurisdiction of the subject-matter of the controversy. (*Palmer* v. *De Witt,* 47 N. Y. 532; *Isaacs* v. *Daly,* 7 J. & S. 511; *Boucicault* v. *Hart,* 13 Blatch. 47; *Dudley* v. *Mayhew,* 3 N. Y. 12; *Tabor* v. *Hoffman,* 118 N. Y. 30; *Kiernan* v. *M. Q. T. Co.,* 50 How. Pr. 194; Drone on Copyright, 97–179; High on Injunctions, 994, 996, 1011.) The plaintiff has never lost its literary property in its reference book of July, 1890. (Bump on Copyright, 517; Drone on Copyright, 284; Coppinger on Copyright, 118, 119; U. S. R. S. ch. 6, tit. 2, § 100; *P. P. Co.* v. *Monroe,* 38 U. S. App. 415.) The plaintiff's proof fully established a cause of action. (*Kier-*

*nan* v. *M. Q. T. Co.*, 50 How. Pr. 199; *J. M. Agency* v. *J. W. P. Co.*, 66 Hun, 38; *Callaghan* v. *Myers*, 128 U. S. 657; *Ladd* v. *Oxnard*, 75 Fed. Rep. 703; *Piper* v. *Hoard*, 107 N. Y. 73; *Kujek* v. *Goldman*, 150 N. Y. 176; *Kelly* v. *Morris*, L. R. [1 Eq.] 697; *Morris* v. *Ashbee*, L. R. [7 Eq.] 34; *Cox* v. *L. & W. J. Co.*, L. R. [9 Eq.] 322; *Palmer* v. *De Witt*, 47 N. Y. 532.)

Parker, Ch. J.   Thus far in the progress of this suit the plaintiff has succeeded in its attempt to convince the court that the original common-law right in the reference books, so called, has not been divested and, therefore, it is entitled to invoke the restraining power of the court to prevent the defendant from using in any way any information obtained therefrom.   To the claim of the defendant, that the plaintiff divested itself of its common-law right by copyrighting the reference books pursuant to the provisions of the Revised Statutes of the United States, the plaintiff makes answer that it had not in fact perfected a copyright of the book and, therefore, its common-law right remains.   It is true that plaintiff recorded the title of the book before publication; caused a copyright notice to be printed on the title page and then delivered to the librarian of Congress two printed copies of the book with the notice of copyright printed on the title page, in pursuance of the statute which requires that such a number of copies shall be delivered to the librarian within ten days after publication.   So far as the record discloses, therefore, it would necessarily appear to any one making an examination of it for the purpose of ascertaining whether the plaintiff had secured to itself the benefit of copyright as to the reference book, that it had succeeded.   But the plaintiff insists that its attempt, or pretended attempt, to secure a copyright was ineffectual, because of the omission on its part to publish the reference book.

We are not concerned in inquiring whether the plaintiff's steps, apparently looking to a copyright of the book, were taken for the purpose of procuring a copyright in good faith,

or merely for the purpose of securing such advantage as might accrue from the appearance of copyright. It, of course, cannot have at the same time the benefit of the copyright statute and also retain its common-law right. No proposition is better settled than that a statutory copyright operates to divest a party of the common-law right. If then what the plaintiff did amounted to such a publication of the reference book as was requisite in connection with the other steps taken to perfect a copyright, its common-law rights were divested and its remedy against violators of the rights thus secured would have been by suit in the United States courts. But publication also operates to destroy the common-law rights, whether a copyright be secured or not. An invention, a painting or a book is the property of its creator. He may keep it for his own exclusive use or enjoyment if he sees fit. The public has no greater right to it, however useful it may be, than it would have to any other part of his personal property. But if he once publishes it, his property right in it is gone and every one may make use of it. A person who writes a book may keep the manuscript without printing it, and prevent any one from seeing it. He may take a still further step and cause the book to be printed and then determine that it shall not be seen by the public and store all the printed copies away, and still he has not made a publication of it within the meaning of the law. It continues to be his property as he has not yet offered it to the public. If, while the books are thus stored away, a copy should be obtained surreptitiously and printed, or should the author loan one of the books to a friend to read and return, and in that manner a copy of the book should fall into the hands of some one who should attempt to print it, the author would be entitled to restrain publication, for the reason that he had not undertaken to put within the reach of the general public such thoughts or facts as he may have expressed or stated in the book. Cases have arisen in which there was a private circulation for a restricted purpose, and the holding has been that it did not constitute a publication, as in *Prince*

*Albert* v. *Strange* (2 DeG. & Smale, 652). · In that case it appeared that Her Majesty and the Prince Consort had given to a number of friends copies of prints and etchings made for their own amusement, and this was held a private circulation and not a publication.

Out of a few cases of the same general character seems to have grown the idea that it is possible for a man by putting restrictions on the use of his books by subscribers, however numerous they may be, to retain in himself forever the common-law right of first publication. If that position be sustained by the judgment of the courts, then will have been obtained judicial legislation of far broader scope and much greater value to authors and others than that offered by the copyright statute.

Our attention has been called to but one previous case in which the precise question presented here has received consideration. In the case of *Ladd* v. *Oxnard* (75 Fed. R. 705) the plaintiff published annually a book entitled " The United Mercantile Agency Credit Ratings," and had 179 subscribers; the stipulation between the complainant in that case and its subscribers was " that the book issued to each subscriber was a loan and not sold, and that if any copy was found in any other hands than those entitled to use it by the permission of the complainants, the publishers might take possession of it." In this case the plaintiff distributed its books under like restrictions. The plaintiff in *Ladd's* case brought his action in the United States Circuit Court, and the defendant sought to prevent a recovery upon the ground that, by reason of the special restriction on the use of the book, the plaintiff had not published it; therefore, his copyright had not been perfected, and the rights of the plaintiff were at common law, and not under the statutes. It will be seen, therefore, that the question was the same as that under consideration. Judge Putnam held that the copyright was complete. From his opinion we quote the following: " He (the defendant) claims that, by reason of the special restriction on the use of the book to which we have referred, there never has been a publication, and that, there-

fore, the rights of the complainants are at common law and not under the statutes, so that this court has no jurisdiction of this suit, both parties being citizens of Massachusetts. It should be said in this connection that while the nature of the use of the complainant's book was sought to be limited in the manner which we have explained, there was no limit placed by the complainants on the extent or number of persons to whom the book might be distributed under the conditions which they had provided. Though adapted specially for persons engaged in the trades of which we have spoken, yet even these are indefinite in number, and there is no evidence that the circulation was intended to be limited to them. In any view it might be difficult to sustain the proposition, because, as the statute now stands, an author is compelled to complete his title to his copyright before publication, so there is at least one point of time, although it may be a very minute one, when the author, who has entitled himself to a copyright, is also entitled to look to the statutes of the United States for protection, notwithstanding he has not published. \* \* \* However, we do not rest the case on this point, because we are satisfied there has been a publication. \* \* \* So far as concerns the interests of the public and the general policy of the copyright statutes, this case stands in all respects practically the same as though the complainants' publication had been sold by unrestricted titles, and there is no substantial reason why, if the complainants had not obtained copyrights, they should now be protected against infringers."

We find ourselves in agreement with the learned judge, not only in the conclusion reached, but also in the argument which led to it, and, before referring to authorities upon that subject, it should be observed that it does not appear from this record but that every person in the United States was at liberty to become a subscriber of the plaintiff, and, as such, entitled to a reference book. Plaintiff's position, therefore, in effect is that a distinction should be drawn between selling or giving a book away and leasing it; that to offer to sell a book to the public or give it to public libraries, where all the public

32

may have access to it, is to publish it; but to lease it to such of. the public as care for it is not to publish it.   The latter is certainly an effective method of putting the contents of the book in the possession of such portions of the public as desire it.   By this method a party parts with the secret in such a way that the public may know it, provided the individuals composing such public are willing to become subscribers and lease the book.   And, if leasing books to the public generally does not constitute a publication of them, then an author or publisher would have but to extend the period of leasing from one year to ninety-nine or nine hundred and ninety-nine years, as is the case in certain leasings of railroads, in order to secure almost as many lessees as there would be purchasers if the books were offered for sale.   The buyer of the average book would be quite content with a restrictive title, which, nevertheless, assures him the possession of a book for either of the periods mentioned.   It has not hitherto been understood to be the law that the common-law right could be so utilized as to secure to an author or publisher a continuing revenue from the public for a much longer period of time than Congress has been willing to grant to him the exclusive right to publish.

We shall now briefly refer to what has been said on the subject which seems to have persuaded counsel that the judgment in this case can be supported.   In the first place it must be conceded it has not been said, except in *Ladd's Case* (*supra*), that leasing a book under an agreement not to show it to any one constitutes a publication of it.   And this is so, probably, because it was not until a comparatively recent period that an attempt seems to have been made to obtain for a book subscribers who should agree that they would neither show nor loan it to others.   So, when Coppinger and Scruton, and Drone and Shortts, in their works on the subject of Copyright, assert that, " To constitute a publication it is necessary that the work should be exposed for sale or offered gratuitously to the general public so that any person may have an opportunity of enjoying that for which copyright is intended to be secured," they did not intend to imply that the leasing of a book for a

year or a term of years, to any and all persons who would accept it on such terms, would not constitute a publication. They did not have such a situation in mind. The consideration and discussion of the principles established by such cases as they succeeded in finding in England and this country, bearing upon the question of publication, did not suggest to them the possibility of such a claim being made.

It will be observed that the general rule which we have quoted from Coppinger, asserts, first, that to expose for sale is to constitute publication. It is not necessary that the book be actually sold; it is sufficient if it be offered to the public. The act of publication is the act of the author, and cannot be dependent upon the act of the purchaser. The actual sale of a copy is evidence that it has been offered to the public, but that fact may also be shown by other evidence. It then asserts that if a book be offered gratuitously to the general public, it will constitute publication. This may be done by presenting it to public libraries, and this is so because the author or publisher by that act, puts it in such a place that all the public may see it if they choose. The reason why exposing for sale or offering gratuitously to the general public constitutes publication, is stated in the last part of the rule as follows: " So that any person may have an opportunity of enjoying that for which copyright is intended to be secured." And this reason, which lies at the foundation of all decisions upon this subject, is applicable to this situation. All persons were given the opportunity of enjoying this book upon the plaintiff's terms. Several cases have arisen where the courts have held that the private circulation of pictures, manuscripts or printed books did not constitute a publication, such as *Prince Albert* v. *Strange* (*supra*); also *Bartlette* v. *Crittenden* (4 McLean, 300), where the plaintiff, a teacher of bookkeeping, for the convenience of his pupils, wrote his system of instructions on separate cards, which they were permitted to keep for their convenience; so a gratuitous circulation of copies of a work among friends and acquaintances has been held not to amount to a publication. *Dr. Paley's Case* (2 V. & B. 23)

was one where a bookseller was restrained from publishing manuscripts left by Dr. Paley for the use of his own parishioners only. Coppinger, in his work on Copyright, at page 117, after considering the last case cited and others, reached the following conclusion : " The distinction is in the limit of the circulation ; if limited to friends and acquaintances it would not be a publication, but if general, and not so limited, it would be." In this case the circulation was not limited to friends and acquaintances, or even to a class. The limitation was upon the character of the use which a subscriber could make of it.

It was the privilege of any and all persons who desired to become subscribers, to obtain possession and use of the reference books. The fact that the publisher of the book undertook to place restrictions on the use which individual purchasers could make of it, the effect of which might be to increase rather than diminish the public demand for the book, does not constitute such a limitation as takes away from the act of the plaintiff its real character, which is that of publication.

In *Callaghan* v. *Myers* (128 U. S. 617) Myers was a reporter of the Supreme Court of the state of Illinois, and desiring to secure a copyright for such portions of the reports as he was entitled to have copyrighted, undertook to provide the three conditions prescribed by the copyright statute, namely : A deposit before publication of a printed copy of the title of the book ; the giving of information of the copyright by the insertion of a notice thereof on the title page or the next page ; and by depositing a copy of the book within three months after the publication. It was insisted, as to one of the volumes, that Myers had not deposited a copy of the book within three months after the publication as the statute then required. It was shown that under the statutes of the state of Illinois a reporter of decisions was required to supply to the secretary of state a certain number of copies of the reports for the purposes expressly provided by law. This statute Myers complied with more than three months before he deposited in the clerk's office a volume of the reports containing the insertion of the notice giving the information of a copyright. It did not

appear that these books were ever distributed from the secretary of state's office, but the court held that the delivery of the copies for the use of the state was a publication of the volumes, and, therefore, his copyright should fail.  Myers did not expose the books for sale in the usual way; he was required by the statute to make delivery of them at the time he did, but that fact was held not to prevent publication, and the reason for it may be found, scattered through the cases bearing upon that subject, in the fact that by the delivery, whatever the occasion for it, the public, or an indefinite portion of it, were assured of access to the book without further action on the part of the author.

The case of *Palmer* v. *De Witt* (47 N. Y. 532) is not in conflict with the views we have expressed.  In that case the plaintiff procured an assignment of a play, which secured to him the author's right of its first printing and publication.  Before printing it he put the play upon the stage, and thus the defendant was able to obtain and print it before the plaintiff did.  Judgment was obtained preventing the defendant from selling, the court holding that the representation of a dramatic composition upon the stage is not such a dedication of it to the public as will authorize others to print and publish it without the author's permission.  On his way to this conclusion Judge ALLEN said: " The rights of an author of a drama in its composition are two-fold.  He is entitled to the profit arising from its performance, and also from the sale of the manuscript, or the printing and publishing of it," and its representation on the stage " does not give to the hearer any title to the manuscript or a copy of it, or a right to the use of a copy."

In *Kiernan* v. *Manhattan Quotation T. Co.* (50 How. Pr. 194) it was held that the transmission of news over telegraphic instruments does not constitute a general publication, the argument being that the case was analogous in principle to the writing and delivery of letters, the writer having such interest therein as will authorize him, in certain cases, to restrain their publication.  Is there any difference, said the court, because he (the plaintiff) writes to his customers by telegraph?

The learned counsel for the respondent, apparently not unmindful that to sustain his contention requires the court to take a very long step in advance of any hitherto taken upon this question, urges the very large pecuniary interest involved for the plaintiff, and insists that courts of equity should find a way to protect property rights such as plaintiff claims, even if there are no precedents for doing so, and refers to the remarks of the court in *Piper* v. *Hoard* (107 N. Y. 73), in which the court said : " If the most that can be said is that the case is novel, and is not brought plainly within the limits of some adjudged case, we think such fact not enough to call for a reversal of this judgment."

If the plaintiff's interests are of so important a character, and the public interest would be best subserved were the law such as plaintiff insists it to be, then is presented a proper subject for legislative action. But our examination leads us to the conclusion that the present state of the law is that if a book be put within reach of the general public, so that all may have access to it, no matter what limitations be put upon the use of it by the individual subscriber or lessee, it is published, and what is known as the common-law copyright, or right of first publication, is gone. So far as is disclosed by this record, the plaintiff was in that situation at the time of the commencement of this action.

The judgment should be reversed and a new trial granted, with costs to abide the event.

GRAY, O'BRIEN and HAIGHT, JJ., concur, and BARTLETT MARTIN and VANN, JJ., concur for reversal upon special ground, as follows :

We concur in the result upon the ground that the plaintiff, by depositing two copies of its reference book in the office of the librarian of Congress, published the same, even if it obtained no copyright; that if it did obtain a copyright, it thereby waived its common-law right of literary property in said book and its statutory rights under Federal legislation can be protected only in the Federal courts.

Judgment reversed.