**Victor A. KRAMER, Plaintiff,**

v.

**Mary NEWMAN, Trustee of the James Agee Trust, Defendant.**

No. 89 CIV 6114 (KC).

United States District Court,
S.D. New York.

Oct. 29, 1990.

ORDER

CONBOY, District Judge:

This action involves copyright claims to several assertedly unpublished works of James Agee, the celebrated twentieth century American author. Plaintiff, an author who seeks to use the works in a book on James Agee, requests a declaration that the manuscripts are in the public domain and that therefore, the defendant, the present Trustee of the James Agee Trust, cannot prevent him from using them. The issue is joined in this motion of the plaintiff for partial summary judgment.

Plaintiff's book, presently entitled *The Development of Agee's Career as a Writer: Literary Documents of Twenty Years* (hereinafter "Documents") contains, substantially in their entirety, seventeen pieces authored by James Agee in which the Trust claims copyright, as well as an essay or article entitled "Scientists and Tramps", which includes extensive excerpts from a draft screenplay or treatment by the same name in which the Trust claims copyright. The Agee pieces in question are the following, in the order in which they appear in the *Documents* Table of Contents, along with the numbers of the pages in *Documents* on which they appear, and the registration number of those that have been copyrighted by the Trust.

Karen Shatzkin, Shatzkin & Reiss, New York City, for plaintiff.

Mark W. Budwig, Rembar & Curtis, New York City, for defendant.

| Title of Piece and *Document* pages | Copyright Registration number and year |
| --- | --- |
| 1. "Pygmalion" (poem) (123–27) | TXu 268–408 (1987) |
| 2. "Reflections on Permit Me Voyage" (193–99) | TXu 270–573 (1987) |
| 3. "Before God and this Company" (201–06) | TXu 270–572 (1987) |
| 4. "James Agee by Himself" (208–10) | B 77285 (1963) |
| 5. "Whenever a critic ..." (212–16) | TXu 270–595 (1987) |
| 6. The Complete "Work" Chapter for Famous Men (276–94) | |
| 7. Notebook entries written in conjunction with Famous Men (296–98) | TXu 270–598 (1987) |
| 8. A letter to an unidentified recipient ("Notes and suggestions ...") (300–09) | |
| 9. A letter to Archibald MacLeish ("This seems a very good selection ...") (311–18) | TXu 268–409 (1987) |
| 10. "Poor child, forgive us ..." (poem) (334–35) | |
| 11. "In the White House ..." (poem) (336–37) | |
| 12. "If gasping but victorious ..." (poem) (338) | |
| 13. "The noise we make ..." (poem) (337–38) | |

| Title of Piece and Document pages | Copyright Registration number and year |
|---|---|
| 14. "We soldiers of all nations ..." (poem) (338–39) | BB 35102 (1968) |
| 15. "Marx, I agree ..." (poem) (339–40) | |
| 16. "All through the night ..." (343–56) | TXu 270–596 (1987) |
| 17. "Scientists and Tramps (357–69) | TXu 270–597 (1987) |
| 18. "1928 Story" (371–389) | BB 35102 (1968) |

---

All of the registrations with numbers beginning "TXu" were obtained by the Trust in 1987. Item 4 was published in *Esquire* magazine in 1963. Esquire, Inc., obtained the copyright and assigned it to the Trust in 1968, which recorded the assignment on August 7, 1968. Items 15 and 18 were published in the *Texas Quarterly*, Spring, 1968 issue with separate copyright notice in the name of the Trust. Affidavit of Mary Newman, Trustee of the James Agee Trust, dated March 13, 1990, 1–2.

Prior to his death in 1955, Agee transferred "all right, title and interest in his unpublished works of every kind together with such right, title and interest as he still had to those various works which were already marketed and published" to his wife, Mia Agee. Affidavit of Martha M. Pearson, dated February 19, 1990, Ex. 4 ("Pearson Aff."). In 1956, Mia Agee transferred these rights to Reverend James Harold Flye ("Father Flye"), a family friend. Pearson Aff. Ex. 5. In 1956, another family friend, David McDowell, formally executed an instrument creating the James Agee Trust, in which the purposes of the Trust are set forth, including the following:

to collect, preserve, organize, edit, hold, manage and control the various writings published and unpublished of the late James Agee; to publish or cause to be published or reprinted any and all writings of the late James Agee; and to hold, transfer, assign, encumber or otherwise receive, own and dispose of in every way all copyrights, reproduction rights, publication rights and other literary rights to these said writings.

Pearson Aff., Ex. 6, 1–2.

In January of 1957, Father Flye transferred all of his right, title and interest in the manuscripts he obtained from Mia Agee to the Trust. Pearson Aff., Ex. 8.

Victor A. Kramer, the plaintiff, is a Professor of English at Georgia State University who has devoted his entire professional life, since 1962, to "scholarly projects pertaining to the writings of James Agee." Affidavit of Victor A. Kramer, dated February 19, 1990, ¶ 2 ("Kramer Aff."). He is an accomplished and recognized scholar, particularly with respect to the life and works of James Agee, Thomas Merton and Frederick Law Olmstead. *Id.*, Ex. 9. As a graduate student at the University of Texas in the early 1960's, he urged the Director of the Harry Ransom Humanities Research Center at the University of Texas (hereinafter "HRC"), F. Warren Roberts, to purchase certain Agee materials and manuscripts then on the market, for HRC's Library.

Sometime in 1963 or 1964, Hamill and Barker, Antiquarian Booksellers in Chicago, offered for sale a collection of manuscripts and documents written by Agee. This collection was offered for sale "without restriction as to persons who could be granted access to read these materials and without restrictions as to their use." Affidavit of F. Warren Roberts, dated February 17, 1990, ¶ 6 ("Roberts Aff."). On March 30, 1964 Hamill and Barker wrote to Mr. Roberts at the HRC and stated:

Here at last, is a factual description of the James Agee papers. We are pleased to offer the material, as listed, for a net of $15,000. This includes manuscripts, notes, letters, typescripts, proofs, sketches and miscellaneous papers; together there are approximately 1785 quarto pages in Agee's small hand, plus some 1700 typed pages many with ms. corrections. Mrs. Agee has assured us that we will have first refusal of additional material, as she is able to give the time to hunt it out.

Roberts Aff., Ex. 1. The accompanying "factual description", from the same exhibit, is here set forth in its entirety:

### JAMES RUFUS AGEE (1909–1955)

Collection of original manuscripts, notes and letters; corrected typescripts, proofs and a few drawings. The manuscript material, both published and unpublished, is heavily corrected and revised throughout; often whole passages are deleted. There is a great deal of careful rewriting, sometimes ten or more trials of one paragraph before the author is satisfied. Agee wrote mostly in pencil on quarto second sheets—yellow or white.

\*        \*        ⁀        ⁑        \*        \*

*Let Us Now Praise Famous Men,* begun 1936, published 1941 Notebook containing ideas, outline and purpose of work Corrected typescript of last part of work Reviews, adverts, letters to do with book Group of 8 short stories written between 1928 and 1946 Headed *Dreams, Story 1928; News Stories on Children who May Die Soon,* etc.

Book Reviews and notices: *Ezra Pound; T.S. Eliot: Charles Frost; Dylan Thomas; H.G. Wells (Death of),* etc. 1939/45 Group of 13 articles on various subjects, probably written for Time Magazine between 1942 and 1946. Religion, movies, politics, *The pre-Aryan Goddess Kali, Pseudo–Folk,* etc.

*Henry Ford* Begins "Henry Ford died last week ...". 1946 Typewritten notes on Ford supplied to Agee from Life Magazine morgue

Articles and letters relating to Newspaper Guild at Time/c. 1945

*Monsieur Verdoux,* played by Chaplin. (See Agee on Film I) Review of the movie for *Nation,* with note from editor dated June 13, 1947

Elaboration of the *Nation* review, apparently for a much longer article. With a note from Agee to Henry Luce, dated July 25, 1947. Probably unpublished.

*Shoeshine,* Italian made movie, 1947. (See Agee on Film I) Review, also Proof

*The Book and the Artist.* Notes and text about a set of photographs by Helen Levitt taken in New York City and in Mexico. Agee wrote the commentary for Helen Levitt's film "The Quiet One" 1948.

Notebook, notes and comments on photography, c. 1948

*Scientists and Tramp,* piece for the TV or movies, with Chaplin cast as the tramp. c. 1948, probably unpublished.

*Wiltwych Movie,* about a "Boy's school for boys who need help" laid on the Hudson near New York City. c. 1948, unpublished

*The Blue Hotel,* critical analysis of the screen play, 1948. (See Agee on Film, II)

*A Death in the Family,* probably begun about 1948, published after the author's death in 1957. [Screen version title is "All the Way Home"]

\*Original manuscript as used for publication, complete except for the prologue which was added by the editors. There are numerous corrections, deletions and side notes

\*Additional manuscript notes and sequences. The first 23 pages consist of a summary of what Agee had in mind, to quote "Maximum simple: Just the story of my relation with my father and, through that, as thoroughly as possible, an image of him—winding into other things on the way but never dwelling on them". This is followed by 91 pages, mostly unused and unpublished—elaboration of the visit to Agee's grandparents, and the events surrounding the birth of his sister.

*The Touch of Nutmeg,* screen version of the story by John Collier; also typescript of original story. c. 1948.

*Comedy's Greatest Era,* written for Life Magazine, 1949. The article appeared on September 3rd and received one of the greatest responses in the magazine's history. (See Agee on Film I). 1st draft, heavily corrected; 2nd draft, partly carbon, some corrections.

*What's Right with the Movies,* "Close–Up" of John Huston, January 1949.

*Undirectable Director*, A Portrait of John Huston. Published in Life Magazine September 18, 1950. (See Agee on Film I) several versions, winter and spring of 1950

*The Morning Watch.* 1st printed in *Botteghe Oscure*, No. VI, 1950. Published by Houghton, Mifflin, April 1951

*Complete original manuscript, corrections and deletions

*Varient passage, notes, etc., mostly unpublished

*The African Queen*, film script based on C.S. Forester novel; written between December 1950 and February 1951 Released 1952 through United Artists, an independent production for Horizon Pictures directed by John Huston. (See Agee on Film II). The film script received an Academy Award.

*Original manuscript with numerous changes and rewriting; synopsis and notes

*Typescript, corrected; some 1st draft, some inserted revises and several versions

*A Mother's Tale*, published Harper's Bazaar, July, 1952

*Mr. Lincoln*, Television play on the Life of Abraham Lincoln, script commissioned by the Ford Foundation, 1952

*The Beginning and the End. A Prologue. Series I.

*Growing Up, Episode # 3. Sept. 15, 1952. 3rd draft

*New Salem, Episode # 4. 1st draft, Aug. 21, 1952 Also, synopsis of whole, and pages from all episodes, plus three letters regarding the work.

*Magia Verde*, script of screen play

*Noa Noa*, based on the Life of Paul Gauguin. Film production was interrupted by Agee's death; script written in 1953. (See Agee on Film, II).

*Original manuscript, numerous changes and deletions, not complete. *Typescript, 1st draft of 1st part

Also, copies of letters, contracts and agreements to do with *Noa Noa*, April to July, 1953

*A Tanglewood Story*, Screen play by James Agee and Howard Taubman. Apparently begun in January 1954; the first draft of the "shooting script" finished January 1955. Probably the last script Agee worked on. Unpublished.

*First, draft, complete, with Ms. corrections

ʰThird? draft, Ms. corrections; first part missing

*Five general outlines, 1954–1955

*Poems*, mostly untitled and undated: "Pygmalion"; "November 1945" (sonnet); "Marx, I agree. Einstein, I partly follow"; "We soldiers of all nations who lie killed/Ask little ..."; "Sleep, child, lie quiet, let be."; "Poor child, forgive us if you can" (several versions); "Tree-climbing is good exercise" and "A./Eigheee./B./Beee./C./Seee ...ex wye Zee" Some others, probably extracted from longer works.

*Sketches*, impressionistic, done with brush in india ink. Frog, cock's head, tree, chipmonk, several faces

*Letters, Agreements, etc.*, miscellaneous, 1942–1954

*Letters, reviews, proofs*, mostly to do with films, mostly done for *Nation*. Paper very brittle, 1943–1948?

*Miscellaneous material*, probably between 1943 and 1947, including outline of "Macbeth", a play titled "He shall kill his father, marry his mother", Wilson, 1944

*Articles not by Agee*, but sent to him to be read George Barbarow: Three kinds of Cinema & Rossellini Dwight Whitney: Hollywood Story, 1948

Tom Dozier: Czech Confession Methods, 1952

John Macdonald: The State of the Movies

\* \* \* \* \* \*

Together: 1785 manuscript pages, 1694 typed pages, and a few letters and proofs

On May 11, 1964 Roberts wrote back, saying he was authorized to purchase the "James Agee Collection" for $15,000. *Id.*, Ex. 2. HRC purchased this material from Hamill and Barker, and "[n]o restrictions accompanied the acquisition of this collection as to the use or availability of these materials to interested readers." *Id.*, ¶ 8.

In responding to the amended complaint, the Trustee does not deny "that the bookseller Hamill & Barker either purchased those manuscripts and documents from the Trust or acted as a commissioned broker for the sale of those documents". Amended Complaint, ¶ 17. The Trustee concedes that "the Trust ... either authorized the sale by Mrs. Agee or ratified it after the fact." Defendant's Memorandum of Law, 8 ("Deft. Mem."). The Trustee does, however, offer her own affidavit from Mr. Roberts, executed a mere two weeks after the aforementioned Roberts affidavit was given to the plaintiff, in which Mr. Roberts asserts that "I can ... state on personal knowledge that [the University of Texas] acquired nothing in the transaction except the ownership of the tangible, physical artifacts that came into the University of Texas' possession. Hamill & Barker did not offer for sale any literary or other intangible rights in these Agee documents, and the University of Texas did not acquire such rights." Affidavit of F. Warren Roberts, dated March 2, 1990, ¶ 2 ("Second Roberts Aff.").

It is uncontested that the literary materials in question are now located at the HRC and that the HRC paid $15,000 for the materials. The major area of disagreement is whether only the physical materials, but not the property interests therein, were conveyed, or whether the conveyance was for all the rights, intellectual and physical, in the materials.

Roberts explains the policy of the HRC as to allowing access to the Agee materials (and other unpublished materials in its collection), as follows:

> [A]ccess to the documents was not available on demand to members of the public generally, but was available on a case-by-case basis to individuals who demonstrated to the HRC's satisfaction their scholarly credentials and purpose. Likewise, photocopies of documents were not available to the public on demand but were made available to individuals on request, explaining to the HRC's satisfaction a scholarly need for such copies. Furthermore, permission to obtain copies was granted by the HRC only on the condition that all photocopies remained the property of UT [University of Texas] and would be returned.

*Id.,* ¶ 3. Then, Roberts concludes that

> [i]t was never the intent of UT and its HRC, by the handling of materials in the HRC collections, to cause any of the works to fall into the public domain. The avoidance of such a result was one of the reasons for the HRC's restrictive policy on access and copying that I have described. Having such a restrictive policy in place would have been in the contemplation of parties to the transfer of any published papers to UT while I served as Director of the HRC.

*Id.,* ¶ 4. It is important to note that he does not affirmatively state that the parties to the sale had this restrictive policy in mind, just that it "would have been in the contemplation of parties to a transfer of any published papers."

Mr. Roberts is careful not to assert that the Trust played any role whatever in fashioning the Library's own standards of control and access, expressed any wish or intention with respect to it, or indeed, even knew about it.

Shortly after HRC procured the materials, the plaintiff helped identify the works and catalogue the collection, and made extensive use of the documents. During this time, plaintiff was writing his doctoral dissertation, entitled *Agee: A Study of the Poetry, Prose, and Unpublished Manuscript,* which he completed in 1966. He sought to have it published through University Microfilms, Inc., (UMI) at Ann Arbor, Michigan. Despite assertions to the contrary, it cannot be disputed that the dissertation, which apparently included reproductions of certain selections of James Agee's poetry and prose manuscripts located at the HRC, was published by UMI in 1969 with the permission of the Trustee of the James Agee Trust. *See* Affidavit of David J. Billick, undated, ¶ 7 and Ex. 8 (letter of permission from Trustee to UMI), attached to the plaintiff's reply papers. When the materials were published, it seems that although plaintiff credited the

Trust as the source of the materials, there was only one copyright—plaintiff's.

After the publication of his dissertation, plaintiff continued to use the materials at the HRC and published a few articles in scholarly journals. In the Texas Quarterly in 1972, Professor Kramer published, in its entirety, the previously unpublished "The Complete Work Chapter" for *Let Us Now Praise Famous Men,* the most famous and most widely read of Agee's work. In a letter to plaintiff from the present Trustee dated July 21, 1986, the Trustee admitted that the Trust did not have a copyright in this manuscript as it had failed to register the Work Chapter with the Copyright Office [implicitly, upon plaintiff's publication of the chapter] and failed to affix a copyright notice. Kramer Aff., ¶ 18 and Ex. 27.

It should be noted, and it is not disputed, that many people other than plaintiff have examined and worked with the Agee materials. An obviously incomplete list of all the people who requested use of the documents is attached to the Affidavit of Martha M. Pearson, dated March 22, 1990, Ex. 5 ("Second Pearson Aff."). We note that the plaintiff's name is not on the list and he is probably the person who used the documents most frequently. The list contains over 45 names. Furthermore, many documents in the collection were reserved exclusively for use by scholars other than the plaintiff, and for whom photocopies were made (sometimes with the permission of the Trust). Finally, it must be observed that the materials themselves in the possession of the HRC did *not* have a copyright notice on them when plaintiff used them and the defendant concedes that it had no statutory copyright under the Copyright Act of 1909.

Plaintiff's theories as to why he should be permitted to publish his book without the Trustee's permission are two-fold. First, he argues that the transfer to the HRC of the materials was made without reservation as to any common law property rights by the seller and that as a result the Trustee cannot impede his plans to publish his book by the University of Tennessee Press. His alternative argument is that

the materials fell into the public domain after he published substantial portions of them in his dissertation and articles, because the Trust did not procure a statutory copyright.

■ Assessment of the plaintiff's claims requires that we explore copyright law prior to the 1976 Copyright Act. Before 1976, the federal Copyright Act of 1909 and the common law of copyright protected the rights of authors in their creative work. The common law of copyright (often referred to as the right of first publication) was not preempted by federal law. State common law protection

> arises upon the creation of any work of art, be it a sketch or a finished product. This common law right protects against unauthorized copying, publishing, vending, performing, and recording. The common law copyright is terminated upon publication of the work by the proprietor of the copyright. Upon termination of the common law copyright, the work falls into the public domain if statutory protection is not obtained by the giving of the requisite notice.

*Letter Edged in Black Press, Inc. v. Public Building Comm'n,* 320 F.Supp. 1303, 1308 (N.D.Ill.1970); *see Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1100–01 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Thus, it has been the "unquestioned law since 1774" that once a work is published, if the owner does not comply with the requirements of the statute law, the work falls into the public domain. *National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir.1951) (Learned Hand, J.) [*clarified* 198 F.2d 927 (2d Cir.1952)]. Courts have labelled publication in these circumstances as "divestitive," as the "distribution or other occurrence that has the consequence of leaving [the] author with no copyright protection." *Roy Export,* 672 F.2d at 1101. The publication divests the owner of his common law copyright and since he has not affixed the proper notice,

he has not secured statutory protection. *Id.* The work enters the public domain.

In order to mitigate the harsh effects of forfeiture of creative rights in such circumstances, the "case law has created a distinction between general and limited publication, holding that only the former operates to divest common law copyright and subject a work to the federal statutory scheme." *American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1026–27 (9th Cir.1981). The Supreme Court has stated that general dissemination is "such a dissemination of the work of art itself among the public, as to justify the belief that it took place with the intention of rendering the work common property." *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 299–300 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907). The definition that is most often quoted is that which appears in *Nimmer on Copyright:* "publication occurs when by the consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or *when an authorized offer is made to dispose of the work in any such manner* even if a sale or other such disposition does not in fact occur." 1 M. Nimmer, *Nimmer on Copyright* Sec. 4.04 at 4–18 (hereafter *"Nimmer"*) (footnotes omitted) (emphasis added).

█ A limited publication "communicates the contents of a (work) ... to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution, or sale ... (and) does not result in the loss of the author's commonlaw copyright to his (work).... [T]he circulation must be restricted both as to persons and purpose, or it can not be called a private or a limited publication." *White v. Kimmell,* 193 F.2d 744, 747–48 (9th Cir.1952), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952). It has been held that the restrictions may be express or implied. *American Vitagraph, Inc. v. Levy,* 659 F.2d at 1027 (citing *Burke v. National Broadcasting Co., Inc.,* 598 F.2d 688, 692 (1st Cir.1979)); *Werckmeister v. American Lithographic Co.,* 134 F. 321, 324 (2d Cir.1904)).

A sale of a work, as opposed to merely a dissemination, however, puts the matter in a different light. Professor Nimmer asserts that a sale to any member of the general public is a publication, citing two cases, *Ross Prods., Inc. v. New York Mdse. Co.,* 233 F.Supp. 260 (S.D.N.Y.1964) and *Gottsberger v. Aldine Book Pub.,* 33 F. 381 (Mass.C.C.1887). In *Ross,* a toy was sold in a department store. The court relied upon *White v. Kimmell, supra* for the proposition that "[i]t cannot be disputed that putting the article on sale to the general public constituted a general publication." 233 F.Supp. at 261. In *Gottsberger,* the plaintiff sent a number of copies of a work to booksellers and private individuals, for examination, and in one instance accepted money for one copy of the work. The court held that the one sale of the work constituted publication of the work and because the sale occurred before the plaintiff procured a statutory copyright, he lost all rights. Though the cases contain much talk of publication occurring upon the sale of a "single copy," *e.g., Bobbs–Merrill Co. v. Straus,* 147 F. 15, 19 (2d Cir.1906), *aff'd,* 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908), "such statements express the thought that the *availability* for public sale constitutes publication even if sales are minimal." *Roy Export,* 672 F.2d at 1102 n. 14. We observe that these "sale" cases, however, usually implicate the placing of a work in a commercial posture which exposes the text to the scrutiny of the general public.

*Jewelers' Mercantile Agency, Ltd. v. Jewelers' Weekly Pub. Co.,* 155 N.Y. 241, 49 N.E. 872 (1889) is interesting, primarily for its dicta regarding the placement of a work in a public library. In that case, the New York Court of Appeals rejected the notion that there is any difference between selling and leasing a work to the general public. 49 N.E. at 874–875. (The plaintiff had subscribers who "leased" the works instead of buying them.) In so doing, the court stated that "to give [a work] to the public libraries where all the public may have access to it is to publish it." *Id.,* 49 N.E. at 874. The court further stated that presenting a work to public libraries (gra-

tuitously or otherwise) will constitute publication because "the author or publisher, by the act, puts it in such a place that all the public may see it if they so choose." *Id.,* 49 N.E. at 875. The court, however, undertook to distinguish between a private circulation and a general publication, concluding that private circulation to friends or acquaintances or even to a class is not a general publication.

In *Ladd v. Oxnard,* 75 F. 703 (Mass.C.C. 1896), 179 subscribers of certain books were issued the books as a "loan" for money, with the restriction that if any copy was found in any other hands the publisher would repossess the books. The court held that while the nature of the use of a particular book was sought to be limited there was no limit placed by the authors on the extent or the number of persons to whom the book had been distributed, and that therefore a general publication occurred. This case hold[s] that "the mere fact that the delivery of copies of a book was under special limitations would not prevent the delivery from constituting a publication, provided the delivery insured that the public, or an indefinite portion of it, should, *without further action on the part of the author, have access to it.*" *Id.* at 730–31 (emphasis added).

Examples given by *Nimmer* as to what constitutes a limited publication are (1) when an author distributes copies of his work to a circle of immediate friends with the express or implied understanding that such copies will not be duplicated or circulated (citing *White v. Kimmell*), and (2) when an author distributes to members of the trade for limited purposes of review or criticism or performance (citing many cases). 1 *Nimmer* Sec. 4.13[A] at 4–66–4–66.1. However, "distribution to retailers for ultimate distribution to the general public in itself constitutes a general, not limited publication." *Id.* at 4–67 (citing *Data Cash Sys., Inc. v. JS & A Group Inc.,* 628 F.2d 1038 (7th Cir.1980)).

▪ Where there is a sale of the subject of the copyright, if there was "any limitation for the benefit of the [seller], that limitation, restriction, or reservation, what-

ever it may be called, must have been expressed or clearly imposed. Otherwise, it will not be presumed." *Grant v. Kellogg Co.,* 58 F.Supp. 48, 51 (S.D.N.Y.1944) (citing *inter alia American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 297, 28 S.Ct. 72, 76, 52 L.Ed. 208 (1907); *Dam v. Kirk La Shelle Co.,* 175 F. 902 (2d Cir.1910); *Pushman v. New York Graphic Society,* 287 N.Y. 302, 39 N.E.2d 249 (1942)).

The New York Court of Appeals, in *Pushman v. New York Graphic Soc.,* 287 N.Y. 302, 39 N.E.2d 249 (1942), citing the federal case of *Parton v. Prang,* 18 Fed. Cas. No. 10,784 (Mass.C.C.1872) stated that if a sale is an absolute and unconditional one, and the article is absolutely and unconditionally delivered to the purchaser, the whole property in the manuscript or picture passes to the purchaser, including the right of publication. In *Pushman,* an artist had sold through his agent a painting to a University. The Court held that "... an artist must, if he wishes to retain or protect the reproduction right, make some reservation of that right when he sells the painting ... an ordinary, straight out bill of sale shows an intention to convey the artist's whole property in his picture. Here there is no substantial proof of a contrary intent ... this unconditional sale carried with it the transfer of the common law copyright and the right to reproduce. Plaintiff took no steps to withhold or control that right. 'The courts cannot read words of limitation into a transfer which the parties do not choose to use.' *Dam v. Kirk La Shelle Co.,* 2 Cir., 175 F. 902, 904 ...'" *Pushman,* 39 N.E.2d at 251.

The case law is clear that it is the seller of the creative work who must express reservations or limitations if the publication is found to be limited. As the New York Court of Appeals has said, "The act of publication is the act of the author, and cannot be dependent upon the act of the purchaser." *Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co.,* 49 N.E. at 875.

▪ If distribution of a work was not limited by the author as to persons or as to purpose, "[i]n legal contemplation it was a

general publication which forfeited [the Trust's] right to a copyright." *Continental Casualty Company v. Beardsley*, 253 F.2d 702, 707 (2d Cir.1958). And of course, "[p]ublication of an intellectual production without copyrighting it causes the work to fall into the public domain. It becomes by such publication dedicated to the public, and any person is thereafter entitled to publish it for his own benefit" *American Code Co., Inc. v. Bensinger, et al.*, 282 F. 829, 833 (2d Cir.1922). It would appear, however, that in this Circuit mere presence of an otherwise unpublished work in an academic library is not the legal equivalent of publication. *Wright v. Warner Books*, 748 F.Supp. 105, 108 (S.D.N.Y.1990); *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.) petition for reh'g denied, 818 F.2d 252, cert. denied, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987).

The papers submitted by both parties on this motion are notable for their lack of clarity and discipline in addressing both the law and facts before us. The plaintiff seems to be arguing that we need not reach the question of whether or not there was a publication, because the Trust is without standing to challenge plaintiff's use of the documents, since it divested itself of all interest, physical and incorporeal, in the documents when it sold them to HRH through Hamill & Barker in 1964. There are three factual, and insurmountable, weaknesses in this argument.

■ First, the items listed in the Hill & Barker addendum to the offer of sale appear to explicitly include only five of the eighteen items sought to be published in *Documents*. More importantly, we have not been given any evidence on the provenance of the five relevant manuscripts mentioned in the offer of sale, and are asked to draw the inference, impermissible on summary judgment, that the text of materials sold in 1964, much of it in a fragmentary and incomplete state, is the same text as that sought to be published in 1990. Secondly, we manifestly do not have a fully integrated contract of sale, such that would allow us to interpret the intention of the parties without recourse to evidence extrinsic to the text. What we have is an offer of sale from Hamill & Barker and a fragmentary record of acceptance in the form of a letter from Mr. Roberts of HRC which references "a memorandum order in accordance with our telephone conversation," which document we do not have. We are thus required to consider the parol evidence of Mr. Roberts, who asserts that HRC did not intend to purchase, and did not receive any of the incorporeal rights in the manuscripts. Thirdly, it is uncontradicted that the three key parties in this lawsuit, the Trust, the Library and the plaintiff author all proceeded, for more than twenty years, upon the assumption that the Trust had indeed retained incorporeal property rights in the manuscripts. Accordingly, we are unable to grant partial summary judgment upon the plaintiff's lack of standing theory.

■ We next must consider whether the Trust and its agent, the Library, have caused by the access given to scholars, a general publication of the manuscripts sought to be published in *Documents*. We cannot find a general publication based upon this record. Although many scholars have had access to the manuscripts collection, comprehensively viewed, we find the factual record deficient in two respects: first, what access have particular scholars had to particular documents in the collection that are germane to plaintiff's proposed book, and second, and more importantly, to what use have those scholars put those documents? Although we find the Trusts' responding papers strangely silent on the entire question of limited publication, which would prevent summary judgment, we cannot grant it on the generalized argument of plaintiff that undifferentiated manuscripts were examined by readers in a research library so there was ipso facto general publication.

■ Finally, we must consider whether the manuscripts sought to be published in plaintiff's book have fallen into the public domain because of their prior publication in 1969, with approval by the Trust, in plaintiff's doctoral dissertation. The only reference in the record before us to specific

documents in the Agee materials that were assertedly published in the dissertation, a complete copy of which was not submitted to the Court, is found in exhibit 10 to the Kramer Affidavit. This submission is apparently and simply a list of document and fragment titles that Professor Kramer says were "published" in whole or in part in the dissertation. It appears that only eight of the eighteen items sought to be published in *Documents*, are contained on this list, and two of these are qualified with the notation that only selections or quotations from these pieces appear in the dissertation. Furthermore, without the full text of the pieces sought to be published in *Documents*, and the full text of the dissertation, the record here cannot support a grant of partial summary judgment. Mr. Kramer's assertion of the fact that the indicated pieces have appeared in print is sufficiently put in issue by the Trust to preclude granting of the motion. We further observe that the record is pervaded by generalizations, imprecise descriptions of the contested materials, and a most unfortunate proclivity on the part of the plaintiff to refer to the subject of this lawsuit as a single entity, that is, the Agee materials, collectively. In view of the fact that these "materials", whatever the constituent components are, have a history extending back more than a quarter of a century, and considering the broad evidence that the "materials" have been substantially added to over time, we could have no confidence in a ruling that would declare that "the materials" fell into the public domain in 1969.

Accordingly, the plaintiff's motion for partial summary judgment is denied. Discovery will close on December 27, 1990, the pretrial order will be filed on January 25, 1991, the trial will commence on February 19, 1991.

SO ORDERED.